Robert T Mills (Arizona Bar #018853)
Sean A Woods (Arizona Bar #028930)
Jordan C. Wolff (Arizona Bar# 034110)
**MILLS + WOODS LAW, PLLC**
5055 North 12th Street, Suite 101
Phoenix, Arizona, 85014
Telephone (480) 999-4556
docket@millsanadwoods.com
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| GA, a minor child, by and through her parent, Lara Scott, and on her own behalf,<br><br>Plaintiffs,<br><br>vs.<br><br>Tanque Verde Unified School District,<br><br>Defendant. | Case No: 4:17-cv-00436-JAS<br><br>**PLAINTIFFS' OPENING BRIEF**<br><br>(Assigned to the Hon. James A. Soto) |

Plaintiffs GA and Lara Scott (collectively referred to as "Plaintiffs"), hereby submit their Opening Brief (the "Brief"). Plaintiffs seek an order from the Court reversing the decision of the administrative law judge ("ALJ") and awarding the relief set forth herein. The Brief is supported by the following memorandum of points and authorities and the record from the administrative hearing (the "Hearing") referenced and incorporated herein.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.        STANDARD OF REVIEW

In evaluating a case filed under the Individuals With Disabilities Education Act ("IDEA"), the District Court "shall receive the records of the Arizona administrative proceedings, shall hear additional evidence at the request of a party, and *basing **its** decision on the preponderance of the evidence*, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(c) (emphasis added). The District

Court proceeding "under the IDEA is a hybrid, akin to a trial de novo." *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir. 1994). Ultimately, the determination of whether the District provided the student with a FAPE is a conclusion of law, which must be reviewed *de novo*. *See Amanda J. v. Clark Cty. Sch. Dist.*, 267 F.3d 877, 887 (9th Cir. 2001).

Further, this Court can accord some deference to the ALJ's factual findings, but only where they are "thorough and careful," and "the extent of deference to be given is within our discretion." *M.C. by & through M.N. v. Antelope Valley Union High Sch. Dist.*, 858 F.3d 1189 (9th Cir. 2017) (citations omitted).

In *M.C.*, the Ninth Circuit cautioned, "neither the duration of the hearing, nor the ALJ's active involvement, nor the length of the ALJ's opinion can ensure that the ALJ was 'thorough and careful.'" *M.C.*, 858 F.3d at 1194. Judge Zuk's 72–page OAH Decision, rendered after a seven-day hearing, contains detailed factual findings and legal conclusions. Additionally, the Administrative Record demonstrates that the ALJ was actively involved in the Hearing; the ALJ questioned witnesses, both to clarify responses as well as to elicit follow-up responses. However, the Court found that, although the ALJ's opinion is lengthy, the OAH Decision evinces a lack of thoroughness with respect to certain issues.

In determining whether an ALJ's factual findings are thorough and careful, as will allow for judicial deference to the findings during review of whether disabled child was afforded a FAPE under IDEA, factors such as the duration of the hearing, the ALJ's active involvement, and the length of the ALJ's opinion are not determinative; rather, court must actually examine record to determine whether it supports ALJ's opinion. *Id.* As described herein, the ALJ's factual findings were neither thorough nor careful. Thus, this Court should not extend any deference to the ALJ's decision.

## II.          JURISDICTION

Parents who have completed a Due Process Hearing under IDEA 20 U.S.C. § 1415(f) with a final decision from an ALJ have a right to an appeal. 20 U.S.C. § 1415(g), (i). In the state of Arizona, parents have the right to appeal the final decision of an ALJ as an original civil action in either state or federal court. 20 A.R.S § 41-1092.08(H); U.S.C. § 1415(i)(2)(A). The district courts of the United States have jurisdiction over actions brought under the IDEA without regard to the amount in controversy. 20 U.S.C. § 1415(i)(3)(A).

## III.          INTRODUCTION

The IDEA, 20 U.S.C. § 1400 *et seq.,* requires that States receiving federal funds assist in educating children with disabilities and provide a free appropriate public education ("FAPE") to all eligible children. *Id.* §1412(a)(1). The United States Supreme Court in *Endrew F. v. Douglas County School District RE-1*, 137 S. Ct. 988 (2017) clarified the standard for determining compliance with the IDEA's requirement that eligible children be provided a FAPE. Rejecting a lax standard adopted by the lower Courts the Supreme Court stated:

> When all is said and done, a student offered an educational program providing 'merely more than *de minimis'* progress from year to year can hardly be said to have been offered an education at all. For children with disabilities, receiving instruction that aims so low would be tantamount to 'sitting idly … awaiting the time when they were old enough to "'drop out.'" *Rowley*, 458 U.S., at 179 (some internal quotation marks omitted). The *IDEA* demands more. It *requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances.*

137 U.S. at 1001. (Emphasis added.)

Plaintiff GA ("GA") was enrolled in second-grade at Tanque Verde Elementary School (the "School") within the Defendant Tanque Verde School District ("the District") in August 2013. At that time, GA was eight-years-old. Due to several medical conditions, GA was a "child with a disability" within the meaning of the IDEA. Ex. I10 at 3290-91. GA suffers from apraxia, a condition which makes it difficult to articulate words. Tr. at

37:20-38:3. She also suffers from epilepsy, binocular dysfunction,[1] pursuit dysfunction,[2] convergence insufficiency, and central auditory processing disorder,[3] which makes it difficult to process distinct sounds from background noise. *Id.* at 11:16-20; 663:9-64:5; Doc. 17-1, GA_000019.

GA repeated second-grade during the 2014-2015 school year. Near the beginning of that year, the District, through second-grade teacher Jill Vengelen,[4] recommended that GA's special education needs be addressed by Vengelen in the regular education classroom.[5] Lara Scott, GA's mother, followed this recommendation. Academic progress reports prepared by the District and provided to Lara indicated that GA's academic performance was satisfactory through her second-grade year[6], and the District advanced GA to the third-grade.

During GA's third-grade year, Dr. Sonya Spolsky, the District's teacher of the hearing-impaired (the "HI Teacher") alerted Lara that she had observed GA in her third-grade classroom and that GA's teacher effectively ignored GA, passing over her during question-and-answer sessions and failing to use any curriculum modified to GA's

---

[1] Binocular dysfunction is when both eyes do not work in conjunction to create a single image.

[2] Dr. Amy Thomas, O.D., FCOVD, explained, "Pursuit is the difficulty being able to track a moving target with both eyes at the same time." Tr. at 663:19-23.

[3] GA can only process 48% of speech without the use of assistive technology—FM system or a filter. (Doc. 17-1, at GA_APPEAL-000019.) However, with the use of a filter, she can process 88% of speech. *Id.*

[4] The District is an entity and can only act through its employees and agents; therefore, the acts of a teacher in the course of her employment ***are*** the acts of the District as she is an agent of the District. *See Davis Next Friend LaShonda D. v. Monroe County Bd. of Educ.,* 526 U.S. 629, 680, 119 S. Ct. 1661, 1689 (1999); *see generally Engel v. Vitale*, 370 U.S. 421, 82 S. Ct. 1261 (1962).

[5] Vengelen explained to Lara that GA clearly did not want to go to Gentry's room and felt that she was capable of "doing the majority of the work" in her regular classroom. Tr., at 160:10-61:2.

[6] As discussed below, GA's progress reports showed no progress on her speech/language goals. In fact, the reports show significant ***regression*** on those goals.

abilities. GA simply spent her time in class playing with paperclips or organizing her desk. Lara then observed for herself GA sitting idly and ignored in her third-grade classroom during a classroom observation.

To protect GA, Lara requested an emergency meeting of GA's IEP team.[7] At this meeting, which was recorded and transcribed, GA's third-grade teacher, Suzanne Hensel, announced that in her opinion, GA was not capable of doing third-grade work and that there was no amount of modification of third-grade curriculum that could help GA learn. Ex. K1, 12:12-14. She stated that the District's special education teacher agreed with this assessment.[8] *Id.* at 12:25-13:1. GA was simply "parked" in a classroom where she made no academic progress. GA had made no academic progress since she started attending school at the District. In fact, evidence suggest that GA may have actually ***regressed*** academically while attending the District.[9] In late January 2016, Debra DeLabio, M.ED., CSP ("DeLabio") was hired by the District to perform an Independent Educational Evaluation ("IEE") of GA. The results demonstrated that GA was performing academically at a ***first-grade level***. Ex. B6, at 2353. Further, by the time GA enrolled in Pathways in April 2016, she was reading *at pre-primer level*. Ex. C15, at 4034. Thus, GA regressed further from January 2016 to April 2016.

---

[7] Lara also removed GA temporarily from the School at that time pending the assignment of a different third grade teacher and an appropriate IEP that the District might actually follow. Lara hired a tutor for GA during her absence from the School in order to prevent any further academic regression.

[8] Hensel affirmed these opinions and also testified that she did not believe GA should have been doing second-grade work either. Tr. at 182:4-6, 1264:19-21.

[9] During the February 29, 2016 IEP Meeting, Juli Daley, GA's replacement third-grade teacher, stated she gave GA the STAR reading assessment when she first came into her classroom. Ex. K6, at 14:11-15. GA was 80% proficient at recognizing her words and comprehending the material; however, it was at a preprimer level. *Id.,* at 14:13-15. Upon hearing this information, Tamara Ballou, Plaintiffs' education advocate, informed the IEP team that "[i]n 2013, [GA] had mastered the preprimer and primer level words. *Id.* And actually, she was 80 percent in the first and second grade words, give or take." *Id.* at 20-23. Daley confirmed that GA had regressed and was back to a preprimer level. *Id.*, at 16:7.

The District had in place for GA an IEP for each of the time periods during which GA attended the School. GA's IEPs largely carried over the same basic goals and objectives from one year to the next, indicating that GA was not making significant progress toward her aims. *See Endrew F,* 137 U.S. at 996. The numerical objectives in GA's IEPs changed minimally over time, but the goals were not tailored to GA's personal needs. Despite repeated requests, the District did not provide Lara with data supporting any progress, or lack thereof, on the part of GA either academically or functionally, or even supporting the goals inserted for GA. Nor did the goals include baselines from which to measure progress.

Before the February 29, 2016 IEP meeting, wherein the District presented to Lara its final offer[10] of FAPE, outside specialist were contracted at Lara's request to evaluate GA and provide information pertinent to the development of an appropriate IEP. Each of these individuals prepared and presented an IEE—a detailed report containing findings after examination of GA and her school environment, as well as recommendations to help GA achieve academically. Exs. B3-6. These reports were provided to the District prior to the February 29, 2016 IEP meeting. Ex. K6, at 4:15-21; 7:7-8. At the meeting, the District offered no criticism of the opinions and observations of these experts, or of their recommendations pertinent to preparation of an appropriate IEP. *See* Ex. K6. Further, the Prior Written Notice ("PWN") stated that the IEEs were not rejected. Ex. C13, at 2627.

The input provided by the experts was nearly completely ignored by the District. It did not invite any of the outside evaluators to attend the February 29, 2016 IEP meeting or to be available by telephone for consultation at the meeting. Ex. K6, at 2. With the exception of a single speech and language goal from the IEE prepared by Lynn Carahaly,

---

[10] The Ninth Circuit has held that "The *IEP* is a "*formal, written offer* [that] creates a clear record that will do much to eliminate troublesome factual disputes … about when placements were offered, what placements were offered, and what additional educational assistance was offered to supplement a placement, if any. *M.C.*, 858 F.3d 1189 (quoting *Union Sch. Dist*, 15 F.3d at 1526 (9th Cir. 1994)). (Emphasis added).

the District did not incorporate any of the recommendations of these experts in the IEP. Ex. B5, at 2334. The IEP largely regurgitated the same goals from all the previous IEPs. *See* Exs. C1, 6, 9, 11, 13. The District's minimal effort to update GA's goals resulted in an IEP that was detrimental to GA, and ignored her personal needs.

The District proposed a dramatic increase in the amount of time GA would spend in the "resource room" receiving special education, but at the IEP meeting was unable to articulate what GA would be doing in the resource room, how that would differ from what she had been doing in the general education classroom, or what curriculum would be used for GA. Nor did the District articulate how the limited speech and language services it was offering would differ from those of the previous year, during which GA *regressed* in her speech and language skills.

At the Hearing, Plaintiffs presented the testimony of these experts, explaining the myriad problems with the IEP that rendered it incapable of providing GA any educational benefit at all. The goals were not measurable, and they were not tailored to GA's specific needs. They did not consider GA's actual abilities or challenge her to achieve academically. They were not developed with an understanding of GA's baseline abilities or with the benefit of consultation with outside experts or specialists. At least one of the goals the District formulated for insertion in GA's IEP called for the use of magnifying strips, would be detrimental to GA given her difficulty in focusing and tracking.

The District presented no contrary evidence. The District did not call any experts to rebut the testimony of these experts called by Plaintiffs. In fact, the District's speech and language teacher testified that she thought Carahaly's report was well done. Tr., at 1141:9-12.

Not only were the IEPs deficient in many respects, the District repeatedly and *unilaterally* changed key provisions of GA's IEP without any notice or input from GA's parents.

In light of the District's treatment of GA, including its failure to follow GA's IEPs, Lara sought to occasionally observe GA in her classroom setting. The District at first

7

1   seemed receptive to Lara's requests, but then refused to allow such observations after the

2   District's lawyer became involved in the discussion.

3          After GA was removed from the District at the end of February 2016, Lara enrolled

4   GA at Pathways. Notably, at Pathways, GA's speech and language skills have improved

5   by objectively verifiable measures. She has improved dramatically and has increased her

6   standard scores while enrolled at Pathways even though she has aged 13 months as well

7   as advancing from third-grade to fourth grade. Tr., at 706:14-20; 903:5-8.

8   **IV.        PROCEDURAL BACKGROUND**

9          On August 24, 2016, Plaintiffs filed a 401 paragraph Due Process Complaint

10  alleging numerous violations of the IDEA, which ultimately resulted in a denial of FAPE.

11  On October 16, 2017, Defendant filed a nine (9) paragraph response. The Hearing was

12  scheduled for five (5) days—February 13-17, 2017; unable to finish within the scheduled

13  five (5) days, the hearing was continued until May 8, 2017. The Hearing concluded the

14  next day on May 9, 2017; lasting a total of seven (7) days. Both parties were instructed to

15  submit closing briefs by June 30, 2017. Subsequently, on August 1, 2017, the ALJ issued

16  her ordered stating the "Respondent School District did not fail to provide Student a

17  FAPE[.]" ALJ Decision, ¶ 139. However, despite concluding that there was not a denial

18  of FAPE, the ALJ determined, "Petitioners established by a preponderance of the

19  evidence that, while Respondent School District provided all of the speech and language

20  services under the 2014 IEP, eight hours of those services were not provided by an SLP,

21  an SLT, or an SLPA in accordance with the 2014 IEP." *Id.* ¶ 135.

22  **V.         THE ALJ ERRED BY COMPLETELY IGNORING THE RE-
23             STATED ISSUES STATEMENT ACCEPTED AT THE HEARING
               WITHOUT OBJECTION FROM THE DISTRICT**

24         The ALJ, in a footnote, stated "While Petitioners raised additional arguments

25  under the heading of Failure to Create Appropriate IEPs in their closing brief, including

26  a lack of specific curriculum, those arguments were not identified in the restatement of

27  the issues following the prehearing conference and, therefore, will not be considered

28  here." ALJ Decision at 20 n.31. However, Plaintiffs made it clear that curriculum was

8

one of the issues. It was noted in a revised issue list as well and within the first ten minutes of the hearing:

> MR. WOODS: Thank you, your Honor.
> The other pending matter I think that we had is we filed a notice of a revised --
> THE JUDGE: Yes.
> MR. WOODS: -- issue list.
> THE JUDGE: Yes. And that did not make it with me in the car. So I know there was accommodations and --
> MR. WOODS: Curriculum --
> THE JUDGE: -- curriculum.
> MR. WOODS: -- added to number three.

Tr. at 8:6-15.

There was no objection from Defendant's counsel at any point regarding submission of curriculum as an issue for decision at the hearing. GA's special education teacher Debbie Gentry admitted during the Hearing that she had available and was trained in a reading program – Wilson – that would benefit GA, but did not use it or any other curriculum with GA. Tr., at 1218:25-19:23. In fact GA had attended the School regularly from early August through mid-September, but Gentry did not use the Wilson reading program with her nor did the District offer GA the Wilson reading program. *Id.* The final offer PWN stated, "The Wilson reading program was *suggested as a possible* reading program for GA and the SPED teacher is trained in the method." Ex. C13, at 2627. (Emphasis added). As the Ninth Circuit pointed out in the *M.C.* case, a discussion is not an offer. *M.C,* 858 F.3d 1189. The Wilson reading program is not mentioned once in the actual IEP. *See* C13.

During the October 29, 2015 IEP meeting, Ballou, speaking directly to Gentry, referenced the Wilson reading program as an "example" curriculum. Ex. K3, 15:6-10. At no time during this meeting did Gentry inform anyone that she was trained in the Wilson program or that it would benefit GA. *See Id.* Additionally, the PWN for the October 29, 2015 IEP Meeting states that, "…a consistent reading program has not yet been initiated."

Ex. C13, at 2627.[11] The District's failure to initiate a reading program despite GA's attendance in school since November 2015, is an indication as to why GA *regressed* to a pre-primer level by the time she enrolled in Pathways in April 2016.

Additionally, it is undisputed that GA has a weakness in writing; however, the District did not have *any* writing curriculum, much less one that is individually tailored to meet her needs as Daley stated that the District had not adopted a curriculum in writing. *Id.*, at 20:16-20, 36:4-08. Finally, the District has *never* produced any documentary evidence showing specific curriculum tailored to GA's needs despite informal and formal requests for it.

Therefore, the ALJ erred by refusing to find or even consider that the District failed to tailor and provide to GA an appropriate curriculum. As a result, the District failed to design and implement an appropriate IEP.

## VI.   THE ALJ ERRED IN FINDING THAT PLAINTIFFS DID NOT PRESENT ANY EVIDENCE THAT GA HAD A VISUAL IMPAIRMENT

34 C.F.R. § 300.8(c)(13) provides, "Visual impairment including blindness means an impairment in vision that, even with correction, adversely affects a child's educational performance."

During the hearing, Dr. Thomas explained GA's visual impairment in great detail:

> … So my findings were without a doubt she had something called *convergence insufficiency*. So she has a hard time crossing her eyes as a team when a target is approaching her. In fact, when I tried to bring a target up to her, you could actually see her try to recede from the target because it was causing too much visual stress. She had problems pursuing with the pursuits, being able to track the moving targets. Actually, even staying on the target and fixating it for long

---

[11] During the February 29, 2016 IEP meeting, Gentry claimed that she was using the Read Naturally program in September 2015 and that GA was at Level 2. Ex. K6, at 115:15-22. However, during the Hearing, Gentry testified that she used the Houghton Mifflin reading series with GA during the first month of school during the 2015-2016 school year. Tr., at 1220:4-8. Further, during the February 29, 2016 IEP meeting, Gentry indicated that she intended to use "Read Naturally" to address GA's reading fluency, but stated that she did not have a specific program to address reading comprehension. Ex. K6, at 123:1:11.

periods of time was difficult for her. Being able to jump from one target to another, problems with that. Problems focusing accurately.

Tr. at 664:2-13. (Emphasis added).

Thomas explained convergence inefficiency:

Q. For GA what does that look like for her?

A. Okay. So for her it's pretty much, it's problems actually being able to get a visual target in and pay attention to it as she's tracking it in.

Q. Okay.

A. She will lose that target multiple times, so it would almost be like a strobe effect, and she's going to end up like having skips in her vision.

Tr. at 664:20-65:02.

Thomas explained GA's pursuit tracking:

Target, yeah. So just being able to watch the teacher move across the room or being able to see a friend move across the room or even her pencil across the paper is going to cause her difficulty. It will actually cause eye strain and headaches. When we go this way, we teach our eyes how to go back and forth.
…
And then there's another one, creeping on all fours that teaches us how to be comfortable in this little zone in front of us. So she had problems with every one single one of those levels. So when she tries to get her eyes to do anything, especially in front of her in this area, how she sees things it's not stable. It's very inconsistent. And she also has a history of epilepsy, so the seizures actually cause static in her vision. So instead of her seeing everything just sitting still like this, she actually sees things moving around like this. Okay? So the major recommendations that I said were to get as much of the busyness out of her environment as possible. Okay? So the first thing I said was move her to the front of the classroom as close to the board as possible and that she has to look straight on at the board. Make sure that she has eye contact with whoever is talking so that you know she's not distracted. Definitely reduce conflicting peripheral stimuli, give instructions singly and help her to visualize those instructions.

Tr. at 665:5-9; 666:24-67:21.

1    During the hearing, Thomas demonstrated, using a "right eye machine" what

2    typical tracking looks like and what GA's tracking looked like. Tr. at 673:23-74:14. The

3    District did not present any evidence rebutting or contradicting Thomas' testimony. The

4    United State Department of Education issued a Memorandum on May 22, 2017 (the

5    "Memo"), stating:

6    
> State eligibility guidelines and definitions for "visual
> impairment including blindness" *may not exclude a child*
7    *with convergence insufficiency or other visual impairment*
> from meeting the IDEA's definition of "visual impairment
8    including blindness" if that condition, even with correction,
> adversely affects that child's educational performance
9    

10   (Doc. 17-1, at 3).

11   Despite Thomas' undisputed testimony and the Memo, the ALJ determined that

12   "Petitioners did not present any evidence establishing [GA] had a visual impairment."

13   ALJ Decision, ¶ 16. This resulted in the ALJ determining that GA was not eligible for

14   special education services regarding her visual impairment. *Id.* Plaintiffs have clearly

15   demonstrated that GA does have a visual impairment as defined under the IDEA. Thus,

16   this Court should reverse the ALJ's decision and determine that the District failed to

17   categorize GA as a student with a visual impairment and the failure to provide any vision

18   related services was a denial of FAPE.[12]

19   **A.    The District Failed to Evaluate GA's Vision**

20   The IDEA places an affirmative duty on states or "local educational agencies"

21   ("LEAs") to identify, locate, and evaluate all children with disabilities residing in the

22   state. 20 U.S.C. § 1412(a)(3); 34 C.F.R. § 300.125 (2000). The evaluation of children is

23   not to be undertaken in a lackluster fashion. The evaluation must be "done early,

24   

25   ――――――――――――――

26   [12] The ALJ's decision does not mention convergence insufficiency once. See ALJ
     Decision. The ALJ's failure to even acknowledge Thomas' testimony regarding any of
27   GA's visual impairments, including convergence insufficiency, further demonstrates that
     the ALJ did not review the record "thorough[ly] and careful[ly]." *M.C.,* 858 F.3d at 1189.
28

1
2
3
4
5
6
7

thoroughly, and reliably." *Timothy O. v. Paso Robles Unified Sch. Dist.*, 822 F.3d 1105, 1110 (9th Cir. 2016). This "is of extreme importance to the education of children." *Id.* If not appropriately undertaken, "many disabilities will go undiagnosed, neglected, or improperly treated in the classroom." *Id.; See also DeKalb County Sch. Dist. v. M.T.V.*, 413 F. Supp. 2d 1322, 206 Educ. L. R. 896 (N.D. Ga. 2005), *aff'd*, 164 Fed. Appx. 900 (11th Cir. Ga. 2006) (Vision therapy to address double vision was a required related service).

8
9

The District completely failed in its obligation to evaluate GA despite being put on notice that GA had visual impairments and despite its own observations of the same.

10

**B.**   **Notice from GA's Father**

11
12

In an email dated August 30, 2013, GA's father, Stacey Abend, informed the District that:

13
14
15

> I have some insight about GA that is important. It involves her reading and ocular motor spasms (left and right eye track separately). This is one of many forms of dyslexia, and one that I also have. I have observed GA reading on many occasions and have seen this occurring.

16
17

Exhibit A20, at 88. Stacey Abend's insight was noted in GA's September 5, 2013 IEP. Ex. C1, at 2418.

18

**C.**   **District Observations**

19
20
21
22
23
24
25
26

Shortly after GA began attending Tanque Verde, Cindy Hodgeson, GA's Adaptive Physical Education Specialist noted in a District "Motor Evaluation" dated August 27, 2013 that GA's "eye tracking was unsmooth with her eyes jumping ahead of the target." Ex. C1 a 2419. Hodgeson further noted that GA "qualifies for Adaptive P.E. services to help improve her overall … eye tracking." *Id*. In addition, the September 5, 2013 MET also noted that GA had difficulty on 3 of 4 reflexes and eye tracking. Ex. I4, at 3. Despite this knowledge the District at no time offered GA vision therapy or any vision related services. Tr., at 80:17-82:11.

27
28

1

**D.    GA Received Private Vision Therapy**

2      Both Dr. Tanya Polec, O.D., FCOVD and Thomas are Doctors of Optometry and

3   hold a Board Certification in Vision Development and Vision Therapy. Polec and Thomas

4   both examined GA and diagnosed GA's vision issues, including Binocular Dysfunction,

5   Pursuit Dysfunction, and convergence insufficiency. Ex B 3, at 2304; Tr. at 663:9-64:5.

6   At the November 19, 2015 MET meeting, Lara provided the MET team with a copy of

7   Polec's report listing the foregoing diagnoses. Tr. 1069:18-70:6; Ex. K4, at 5:5-6.

8      In addition to providing the vision report to the MET team, Lara informed the MET

9   team that Polec was GA's developmental ophthalmologist and she was willing to come

10  to any future IEP meetings. Ex. K4, at 98:6-13. Lara specifically stated that GA is

11  "continu[ing] with her vision therapy once in person in – in office once a week, then daily

12  for 30 minutes." Ex. K6, at 30:14-15. Cooper responded that it would be great to have

13  Polec at IEP meetings, and that she believes she knew Polec and she has been to other

14  IEP meetings. Ex. K4 at 98:14-16. However, Cooper testified that neither she nor anyone

15  else from the District to her knowledge ever contacted Polec. Tr.at 82:4-5, 9-11; Ex. K6,

16  at 69:10-20.

17     Further, at no time did anyone from the District ask about the vision therapies GA

18  was receiving. During the February 29, 2016 IEP Meeting, Selger stated:

19           MS. SELGER: … was waiting for the outside is which is the
             best device, the -- the visual strip, the magnifier, or whatever.
20           And, you know, that's what I -- I was hoping that whatever
             we use, we all have to use the same thing consistently.
21           MS. BALLOU: What does -- what does her outside vision
             therapist think?
22           MS. SELGER: I don't know.

23  Ex. K6, at 77:14-22.

24     **E.    The Single Vision Goal in the February 29, 2016 IEP Would Actually
             be Detrimental to GA**

25     During the hearing, Thomas demonstrated what GA's vision is like. Tr., 673:23-

26  74:14. Thomas explained that GA is distracted from the central target. *Id.* at 674:12-13.

27  Thomas explained the central target "would be anything like reading, anything like trying

28

14

to make eye contact with somebody, trying to do any kind of sports." *Id.* at 675:12-15. Thomas said she first examined GA by using her finger and noticed "her eyes were jumping all over the place." *Id.* at 676:7-11. This is exactly what GA's father's email described, as documented in GA's IEP with the School in September 2013. Ex. C1, at 2420. Further, in the September 2013 IEP, the Adaptive PE notes stated, "On the eye tracking she had difficulty tracking smoothly with her eyes jumping ahead." *Id.* at 2419. As a result, one (1) goal was created to assist GA's tracking. Ex. C1, at 2423. However, her eye tracking issues were completely removed from the September 11, 2014 IEP. There was no further mention of GA's eye tracking issues and no goals or services added to address the same until February 29, 2016. *See* Exs. C 6-13.

Despite having no consultation with GA's vision doctors— Polec and Thomas— the District inserted the following goal in its February 29, 2016 IEP and final offer of FAPE:

> [GA] will appropriately use visual tracking and ***magnifying strips*** on a regular basis to improve her reading fluency and left to right tracking on test. 4/5 days teacher report and therapist observational data documented monthly and reported quarterly.

This goal, unlike most of the others in the IEP *did* have a baseline: 1/5 days. Ex. C13, at 2621. Cooper testified that the inclusion of this baseline meant someone at the District actually had at least attempted to use magnifying strips with GA before. Tr. 83:1-6.

Thomas testified that using magnifying strips would be ***detrimental*** to GA. *Id.* at 671:15-72:11. She further testified that she would not recommend the goals as listed for GA. *Id.* The District did not dispute Thomas' testimony. The undisputed testimony of Thomas regarding the magnifying strips and the harm it would do to GA on its face establishes that the February 29, 2016 IEP was not reasonably calculated to provide GA with a FAPE. Additionally, as a result of the District failing to provide GA with critical

1  vision therapy for the 2014-2015 and 2015-2016 school years, the District failed to

2  provide GA with a FAPE.[13]

3  **VII.       THE ALJ ERRED IN DETERMINING THE UNILATERAL
            CHANGES MADE TO GA'S IEP WERE "INADVERTENT**

4  **DRAFTING ERRORS"**

5          Of the numerous unilateral changes presented at the Hearing, the ALJ discussed

6  only two (2) and brushed them off as inadvertent mistakes. ALJ Decision ¶¶ 28, 61. She

7  ignored the numerous other unilateral changes the District made to the IEP from 2014-

8  2016. Unilateral changes to the IEP, inadvertent or not, are *per se* procedural violations

9  of the IDEA. The Ninth Circuit recently addressed this issue, stating,

10             The district judge agreed with the ALJ's finding "that the
              September 17, 2012 Amendment merely corrected an

11             unintentional error in the August 2, 2012 IEP." We fail to see
              how this can be so. ***An IEP, like a contract, may not be***

12             ***changed unilaterally.*** It embodies a binding commitment and
              provides notice to both parties as to what services will be

13             provided to the student during the period covered by the IEP.
              If the District discovered that the IEP did not reflect its

14             understanding of the parties' agreement, it was required to
              notify M.N. and seek her consent for any amendment. *See* 20

15             U.S.C. § 1414(d)(3)(D), (F) (discussing amendments to the
              IEP). Absent such consent, the District was bound by the IEP

16             as written unless it sought to re-open the IEP process and
              proposed a different IEP.

17             …
              Allowing the District to change the IEP unilaterally

18             undermines its function of giving notice of the services the
              school district has agreed to provide and measuring the

19             student's progress toward the goals outlined in the IEP.
              Moreover, ***any such unilateral amendment is a per se***

20             ***procedural violation of the IDEA*** because it vitiates the
              parents' right to participate at every step of the IEP drafting

21             process

22  *M.C.*, 858 F.3d at 1197. (Emphasis added).

23

24

25

26  _____

[13] Rather than actually attempting to rebut any of Plaintiffs' evidence at the Hearing, the

27  District now belatedly offers the affidavit of Cooper without any foundation that she is in
   any way qualified to opine on these topics. She has no expertise that would qualify her to

28  opine.

## A.   Denial of Parental Participation in Development Of The IEPs

The core of the IDEA is the collaborative process between the parents and the school officials to fashion the IEP. *Endrew F*., 137 U.S. at 994 (citing 20 U.S.C. § 1414). This collaboration among the parents and educators ensures careful consideration of the child's individual circumstances. *Id.* Compliance with the IDEA's procedural safeguards "is essential to ensuring that every eligible child receives a FAPE, and those procedures which provide for meaningful parent participation are particularly important." *Amanda J., 267 F.3d at 891*. Procedural violations "that interfere with parental participation in the IEP formulation process undermine the very essence of the IDEA." *Id.* at 892. *See* 20 U.S.C. § 1414(d)(1)(B)(i) (requiring the inclusion of parents on the IEP team); 34 C.F.R. § 300.321(a)(1) (same); 20 U.S.C. § 1415(b)(1) (requiring opportunities for parents "to participate in meetings with respect to identification, evaluation and educational placement of the child"). The Supreme Court has stressed that the IDEA's structure relies upon parental participation to ensure the substantive success of the IDEA in providing quality education to disabled students:

> [W]e think that the importance ***Congress attached to these procedural safeguards cannot be gainsaid.*** It seems to us no exaggeration to say that Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process as it did upon the measurement of the resulting IEP against a substantive standard. We think that the ***congressional emphasis upon full participation of concerned parties throughout the development of the IEP*** ... demonstrates the legislative conviction that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP.

*Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester County v. Rowley,* 458 U.S. 176, 205-06, 102 S. Ct. 3034, 3050 (1982) (citation omitted) (emphasis added); *see also Schaffer v. Weast*, 546 U.S. 49, 53, 126 S.Ct. 528 (2005) ("The core of the [IDEA] ... is the cooperative process that it establishes between parents and schools.... The central vehicle for this collaboration is the IEP process."); *Honig v. Doe*, 484 U.S. 305, 311, 108 S.Ct. 592 (1988) ("Congress repeatedly emphasized throughout the [IDEA] the

17

importance and ***indeed the necessity of parental participation*** in both the development of the IEP and any subsequent assessments of its effectiveness.") (emphasis added).

The Ninth Circuit has held that parental participation safeguards are "[a]mong the most important procedural safeguards" in the IDEA and that "[p]rocedural violations that interfere with parental participation in the IEP formulation process undermine the very essence of the IDEA." *Amanda J.*, 267 F.3d at 882, 892. The Ninth Circuit explained that parental participation is key to the operation of the IDEA for two reasons: "Parents not only represent the best interests of their child in the IEP development process, they also provide information about the child critical to developing a comprehensive IEP and which only they are in a position to know." *Id.* at 882.

### B.   The District Unilaterally Changed Material Terms of GA's IEPs Without Notice and Without Discussion.

#### 1.   The FM System

A test for auditory processing disorders in children administered to GA in September 2011 indicated that GA was in the "disordered" range of auditory processing abilities. Ex. E12, at 2761. Norrix, an audiologist at Tucson Medical Center where the test was administered, recommended the use of a personal FM system on a regular basis if it significantly improved GA's classroom listening. *Id.,* at 2762. An FM system consists of a microphone and transmitter, which is worn by the teacher or other speaker, and an in-the-ear receiver, which is worn by GA. The system reduces ambient, nonvital sounds. Ex. I10, at 3266.

The use of an FM system was implemented while GA was attending Tucson Unified School District ("TUSD"), before she moved into the District. The use of the FM system in fact greatly improved GA's listening abilities at school. In an email dated July 17, 2013, as GA was transferring into the District, Lara related to Cheryl Leeper, the Educational Audiologist at TUSD that "GA ***thrived*** from having the FM system in ways I cannot describe." Ex. A21 (emphasis added). Leeper responded, "It was wonderful to see how well she was doing once we implemented the FM system!" *Id.*

The District initially recognized the severity of GA's auditory processing deficit and the importance of the FM system to GA. The Occupational Therapy section of GA's September 5, 2013 MET noted the following:

> Mother had expressed concerns at the initial staff meeting over GA's difficulty eating in the noisy cafeteria due to her severe Auditory Processing difficulty. Observation on the first day in the lunch room noted that this was a well founded concern. *GA appeared like a dear [sic] in the head lights* and did not eat more than two bites of food. Since that time she has been eating with a buddy in various SPED staff rooms and is noted to eat most of her meal. GA *uses an FM system in the class [to] help her focus and cue in to the teacher*. Mother states that this has *made a significant difference* in her ability to keep up with the academic work in class. This has been implemented in her second-grade class.

Ex. I4, p. 13. (Emphasis added). In a 2015 email to School principal Susan Centers, GA's second-grade teacher, Jill Vengelen, explained that GA's FM system had stopped working, and emphasized that GA "NEEDS this device. Without it she is incapable of hearing me due to the amplification of background noise." Ex. A20, at 522.

The District offered the continued use of the FM system as an educational accommodation. In GA's September 5, 2013 IEP (and the February 12, 2014 Addendum thereto) the District noted that "The use of a personal FM system improves GA's ability to process directions and oral language in all classrooms as it reduces the signal-to-noise ratio of spoken language." Ex. C6 at 2496. Accordingly, the IEP offered use of the FM system "throughout [the] school day." The District also noted in GA's September 5, 2013 MET that GA "benefits from an FM system in the classroom [and] all specials and therapies." Ex I 4, at 3203. GA's September 11, 2014 IEP, which remained in effect until September 10, 2015, specified that the FM system was to be used on the "School Campus" and "throughout day." Ex. C6, at. 2491.

Spolsky spoke at a meeting held on September 18, 2015 and attended by Lara and several representatives of the District, including Susan Centers, Suzanne Hensel, Debbie Gentry, and Sally Glennon. Ex. K1, at 2:4-10. Spolsky stated:

DR. SPOLSKY: I – I believe and from – this is research based. I've read research on auto process – auditory processing disorder and the use of FMs –
MS. SCOTT: Um-hmm.
DR. SPOLSKY: -- with control groups and experimental groups. So you have kids that are not using it, and kids that are using the FM. And consistently the children that are in the experimental group are scoring higher, performing better, doing well academically and behaviorally. I – *my professional opinion is it should be used as much as possible* because the goal here is to get that signal-to-noise ratio down.
…
DR. COOPER: Is it a good idea for her to use it in motor lab and adaptive PE?
DR. SPOLSKY: Yes. I mean, I would liken it to a cochlear implant, where *it should be on all waking hours, you know, at the school.*
I would also recommend that it be *passed between children* because the minute it's not – it's on the teacher, but someone else is speaking, she is – she doesn't have that signal-to-noise ration reduced.

Ex. K1, at 31-32. (Emphasis added). Spolsky also noted in GA's November 19, 2015 MET Report that "***GA benefits greatly from the use of a personal FM system***." Ex. I10, at 3266. (Emphasis added).

GA's IEP team met on September 10, 2015 to develop an IEP for the 2014-2015 school year.  Gentry testified that she remembers no discussion regarding changing the frequency of use of GA's FM system to anything other than "throughout the day," and there was no agreement to do so. Tr., at 1183:9-12. None of the three different PWNs the District sent Laura in connection with the September 10, 2015 IEP meeting made any mention of changing the use of the FM system. Def. Ex 8; Tr., at 67-68.

Gentry testified that she changed the language in GA's September 10, 2015 IEP from use of the FM system "throughout the day" to "PRN." Tr., at 1182:16-18. She further admitted under oath that she did so despite the fact that there was no discussion or agreement to such a change in the use of the FM system at the September 10, 2015 IEP meeting. Tr., at 1183:9-12.

The District did not provide Lara a copy of the finalized September 10, 2015 IEP until October 7, 2015. Ex. C9, at 2551. Gentry and other agents of the District had attended the September 18, 2015 meeting at which Spolsky explained the FM system

needed to be used as much as possible and throughout the school day. The IEP deviated significantly in many material respects from the matters discussed at the IEP meeting and the matters included in the PWN associated with the meeting. *Id.* The District unilaterally changed the provision for use of the FM system from "throughout the day" to "PRN" (meaning "as needed"). Tr., at 1182:16-18; 1183:9-12.

The change in use of the FM system was a material change to GA's IEP.[14] This material change was a *per se* procedural violation of the IDEA, and it was also in direct contravention of the opinion of the only individual on the District's staff with training and expertise in the use of FM systems.[15] Carahaly, the Speech and Language therapist retained by the District to perform an IEE agreed that GA's FM system should be used throughout the school day. Tr., at 618:23-25.

Lara wrote the District an email detailing many errors and omissions in the IEP. Ex. A20, at 2072-74. The District inserted the contents of Lara's email verbatim in an IEP Addendum dated October 29, 2015, in a section entitled "Summary of Conference Discussion." Ex. C11, at 2567-68. That section included the observation that it was "well understood by the entire team" that the term "PRN" or "as needed" was inappropriate for use in GA's IEP. *Id.* at. 2568. The Addendum also included a statement from Lara that "We requested that the use of the FM system be restored to used 'throughout the day' rather than 'prn'/as needed, as previously recommended by the HI Teacher and as was changed outside of the IEP Team." *Id.* at 2570. The District then changed the Services page of the IEP to reflect that the FM system was to be used "always." *Id.* at. 2584.

In the February 29, 2016 IEP, the District again severely restricted the use of the FM system. The IEP specified, without any discussion at the IEP meeting and without any notice provided in the PWN, that the FM system was to be used only during "whole

---

[14] Even the District's psychologist, Jane Cooper, admitted that the term "PRN" is very subjective, and that one person's opinion of what use was necessary could differ dramatically from another person's opinion. Tr., at 62:4-12.

[15] Norrix admitted that she was not an expert in the use of FM systems. Def. Ex. 28

group instruction," Ex. C13, at 2625, and "in the regular ed classroom." *Id.,* at 2622. The IEP specified that GA would spend 670 minutes (over 11 hours) per week receiving "individualized" instruction in the "Resource Classroom" and in the "Therapy Room." *Id*. at 2625. Thus, the amount of time GA would actually be in the "regular ed" classroom and receiving "whole group instruction" (and consequently using the FM system) was limited. The limitation of the FM system in the February 29, 2016 IEP would drastically effect and potentially destroy any possibility for GA to receive any educational benefit. By the time of the February 29, 2016 IEP Meeting, Spolsky had left her employment with the District and no HI teacher or equivalent was at the meeting. Ex. K6, at 3:3-16. This means that the District changed the frequency of use without any recommendation from a qualified individual.[16][17]

**2.    *The District Unilaterally Removed Eligibility for Services Including Special Education Services for Speech/Language Impairment, and Unilaterally Removed All Speech and Language Goals and Services.***

GA has a severe speech impairment. Exs. B 5, at 2333; I 10, at 3262; Tr., at 254:22. Lara testified that she wanted GA to receive speech services. Tr. at 331:11-18; 987:16-24. Whatever speech and language therapy the District provided to GA in the resource room did not provide her any benefit. In fact, the documentation the District provided Lara demonstrates that GA actually *regressed* in her speech and language goals during the 2014-2015 school year and one of the goals was abandoned by the end of the school year. Ex. G11.

At the beginning of the 2014-2015 school year, GA's IEP team agreed to discontinue pulling GA out of the regular classroom for speech and language services. According to the October 29, 2015 IEP Addendum, "GA continues to qualify for language therapy, however *the team determined* that her *language needs* will be *addressed in the*

---

[16] In an email exchange between Cooper and Norrix, who is an Audiologist, on January 21, 2016, Norrix denied expertise in the use of FM Systems. Def. Ex. 28

[17] The Able Kids report determined that GA does have a CAPD. (Doc. 17-1, at 20.)

*regular ed classroom* with consultative support and indirect support from the SLP." Ex. C11 at 2576. (Emphasis added.) *See also* Ex. C13, at 2616; Tr., 974:7-24; Ex. I10, p. 3266 ("…parents requested that GA develop her *auditory processing and comprehension skills in the context of the classroom* and the *team agreed*.") (Emphasis added.)[18]

The District unilaterally deleted from the September 10, 2015 IEP GA's eligibility for services under the category "Speech/Language Impairment." Ex. C 9 at 1. At the same time the District deleted from the IEP, without any discussion at the IEP meeting or any notice provided in the accompanying PWN, all speech and language goals. *Id.* at 6-8. The District also removed all offers of speech and language services for GA. *Id.* at 11.

Cooper testified that the deletion of the eligibility for special education services was a mistake. Tr. at 1006:9-20. However, at the October 29, 2015 IEP meeting, Cooper indicated that the District had intentionally removed eligibility from Speech and Language:

> MS. BALLOU: The category of eligibility was OHI and SLI. The SLI isn't showing up on this IEP. The -- how she's serviced and whether she's serviced is – is not what -- but when did we exit her off of the SLI?
> DR. COOPER: Actually, that was Mom's request.
> MS. BALLOU: Not for the service time, because it was -- but **when did we find her not eligible for speech?**
> DR. COOPER: At this last IEP.

Ex. K3, at 6:13-21. (Emphasis added)

Moreover, there were no speech and language goals or related services placed in any IEP during the 2015-2016 school year until the final offer IEP on February 29, 2016. *See* Exs. C9, 11, 13. There was no agreement on the part of the parents or the IEP team as a whole to remove speech and language goals and services necessary to help GA accomplish those goals. Buckley testified:

> Q. But Lara never said to you that she didn't want there to be goals; right?

---

[18] There is also no evidence that anyone on GA's IEP team, or anyone else at the District for that matter, documented any disagreement with discontinuing the provision of speech and language services in the resource room.

A.·… No.·
Q.·In the addendum to the September 29 IEP, the October 29 addendum -- … the speech and language eligibility had been·put back in; right?
A. Yes.
Q.·And that was done because Ms. Scott insisted on it; right?
A.·It was a mistake that had been taken out, yes.
Q.·And Ms. Scott called you out on it; right?
A.·Yes.
…
Q. There are no speech and language goals in --
A.·Correct.
Q. -- this addendum; right?

Tr. at 1100:9-01:13; Ex. C11. Additionally, Cooper admitted that Lara never said she did not want speech and language goals. *Id.* at 1099:15-21.

The language quoted above from GA's IEPs and MET indicates only that GA would not be removed from the regular education classroom for speech and language services. Exs. C9; I10, at 3266. It says nothing about the removal of goals or work toward those goals. *See Id.* The IEP team simply agreed that GA's speech and language goals would be worked on in the regular education classroom "with consultative support and indirect support from the SLP." Ex. C11 at 2576, 2584. There is no evidence that Lara requested that Speech and Language goals be removed from the IEP.

Without goals, GA was, *per se*, denied FAPE. The IDEA requires that every IEP set out "measurable annual goals, including academic and functional goals," along with a "description of how the child's progress toward meeting" those goals will be gauged. 20 U.S.C. §§ 1414(d)(1)(A)(i)(I)-(III); *Endrew F.*, 137 U.S. at 994. Throughout her attendance at the District during the 2015-2016 school year, GA had no speech and language goals, and apparently no one even monitoring any progress or regression in her speech and language skills. In addition, the District has provided no record of any consultative or indirect support from the District's SLP. *See* Tr., 1102:9-03:20. Buckley, the District's SLP, admitted that she essentially washed her hands of GA once the decision was made to discontinue speech and language services in the resource room.

Q. Do you have any data tracking her progress or lack of progress in speech and language during that school year?
…
A. I couldn't collect data on a student I wasn't seeing.

24

Q. Well, you were providing consultative services to her teacher; right?

A. … I was providing consultative services to the teacher.

Q. And so you would see GA from time to time?

A. I didn't pull her out for therapy, but yeah, I saw her a lot but -- I'm sorry.

Q. … [S]he didn't have any speech and language goals in place after September 10, 2015?

A. No because she wasn't receiving my services.

Q. … [S]he also didn't have any goals in the IEP; right?

A. After speech was discontinued I wouldn't write a goal because she wasn't receiving services.

Q. Is there any documentation anywhere that you can think of for the 2015-2016 school year up until February, 2016, showing GA's progress or lack of progress in the speech and language –

A. Anything in third-grade?

Q. Right.

A. Well, since I wasn't seeing her, no, I wouldn't be documenting her progress.

Tr., at 1157:24-59:2. (Emphasis Added).

In the February 29, 2016 IEP meeting, Buckley stated that she did not have any therapy logs, and the IEP team would just have to take her word. Ex. K6., at 40:21-41:6. However, when asked if she keeps therapy logs of her therapy sessions with students, she testified that she does. Tr., at 1150:6-8. Buckley was asked if she provided the therapy logs to GA's parents, she testified that she *shredded* her records related to GA. Tr., at 1150:16-51:3. Furthermore, Buckley admitted that she destroyed the documents after the September 10, 2015 IEP meeting. Tr., at 1152:20-53:2.[19]

The speech and language services have been an issue since GA's second-grade year. Buckley's act of destroying all her records regarding GA's speech services severely impacted Lara's ability to participate in creating an appropriate IEP for GA. The only tangible evidence available regarding GA's speech services are progress reports undisputedly showing that she regressed. This also denied Lara the opportunity to challenge the any of the findings and recommendations. *S.F.* 2012 WL 718589, at *9.

There is no record that the District provided any "consultative support" for speech and language in GA's classroom. Buckley admitted that any such support would have

---

[19] Buckley did not document *any* disagreement with this decision.

25

been provided, not by a speech and language professional, but by the special education teacher in the resource room:

> A. I believe that the resource teacher was providing consultative service, I should say support, but there were no goals written. So I don't know whether there's actual data. But she certainly was, as the request was, trying to follow up with speech and language support in the resource room.
> Q. Who was the resource provider?
> A. Debbie Gentry.

Tr., at 1159:4-11. Gentry is not an SLP nor an SLPA. There is no evidence that she has any training in the provision of speech and language services to disabled children.

The February 29, 2016 IEP contained a single Speech and Language goal. Buckley, who had admittedly not worked with GA since the 2014-15 school year, after purportedly reading the IEE of Carahaly for 15 minutes, lifted this goal verbatim from the Carahaly IEE and inserted it in the IEP. Exs. C13, at 2620; B5, at 2334; Tr., at 630:24-31:5. Carahaly had in fact included seven (7) goals in her IEE, but testified they were not meant to be simply lifted verbatim, but rather tailored to a child's individual needs. Ex. B5, at 2334. Carahaly testified that the speech and language goal and services offered in the February 29, 2016 IEP were not designed to provide GA with an educational benefit. Tr., at 635:22-36:18. Furthermore, in the February 29, 2016 IEP, the District only offered 30 minutes of speech and language services.[20]

### 3.    *Other Unilateral Changes to IEPs*

Between September 11, 2014 and September 10, 2015, the following unilateral changes were made:

Deleted Accommodations:

- Minimize Distractions in the classroom
- Make certain the student understands the directions
- Allow more time to complete written assignments
- Break down assignments into smaller parts
- Provide visual cues
- Allow extra test time

---

[20] This is despite the fact that Buckley had suggested 60 minutes would be appropriate and Carahaly had suggested 120 minutes would be appropriate.

Added Accommodations:

- Provide consistent daily routine
- Adjust level of questioning
- Accept concrete answers
- Read aloud to students
- Permit student to dictate responses for assignments
- Limit amount of required reading
- Keep expectations consistent with ability level
- Permit student to dictate responses for test
- Test administered individually
- Lunch with buddy in quiet area with para support
- Allow to eat a snack at any time of day/snacks kept in classroom
- Permitted breaks/alternate activities as needed
- No timed assignments other than progress monitoring

*See* Exs. C6 at 2488, C9, at 2531. In the three (3) different PWNs that were issued for the September 10, 2015 IEP not a single one mentioned the word "accommodation." *See* Def. Ex. 8.

Further, the District made unilateral changes to the IEPs and the PWNs after they were given to Lara.

At the Hearing, Plaintiffs presented a PWN dated March 1, 2016 as Exhibit C13. That PWN contained the following language:

> The independent evaluations were considered. The auditory processing evaluation was discussed and considered. Curriculum and specialized instruction was discussed and considered. The Wilson reading program was suggested as a possible reading program for GA and the sped teacher is trained in the method. GA's mom declined services in the resource room the previous school year and much of the current school year so a consistent reading program has not yet been initiated. GA's mom and advocate stated they will be placing GA in a private day school.

Ex. C13, at 2627. Under the section entitled "Reasons the above listed were rejected" Ex. C13 also states:

> The above Issues were not rejected. The evaluation for an auditory processing disorder concluded GA would not be diagnosed with an APD by the audiologist due to comorbid attention, language, and cognitive issues indicative of a larger neurological disability. However, the FM system is recommended if it benefits GA to attend to speech In a noisy environment. The FM system is included in GA's IEP as long as it benefits her and does not distract her from academic tasks.

27

*Id.* This exhibit C13 was the PWN the District provided to Lara in March 2016.

At the hearing, the District also presented a PWN dated March 1, 2016 as exhibit 32. The District's exhibit 32 does not include the language quoted above. Plaintiffs' Exhibit C13 has a print date of March 17, 2016.  The District's Exhibit 32 has a print date of October 17, 2016, seven (7) months *later* than the PWN the District provided to Lara.

The District's witnesses admitted that someone would have to deliberately edited the PWN in their IEP software and deliberately deleted the language for it to have printed without the language in Ex. C13. Tr., at 51:22-52:4, 1195:5-96:18. No District employee could explain how sections of the PWN were deleted in the District's version of the PWN produced for and admitted at the Hearing. Tr. at 1025:23-26:2; Tr. at 1197:25-98:7.

The following were additional differences between the District's Hearing exhibits and Plaintiffs' Hearing exhibits (the Plaintiffs' exhibits were the only copies provided to Lara by the District):

The District's October 29, 2015 IEP Addendum, with a print date of October 26, 2016, has, "Supplemental Support for Physical Therapy on an "as needed" basis. Def. Ex 17, at 18. The Petitioners October 29, 2015 IEP Addendum is completely missing that service. Ex. C11, at 2584.

The District's October 29, 2015 IEP Addendum "Cover Sheet Signature Section" with a print date of March 8, 2016,[21] has a signature page with all the District employees signature, but Lara's and her advocate's signature is missing. Def. Ex. 17.[22] The Petitioners October 29, 2015 IEP Addendum "Cover Sheet Signature Section" is completely blank. Ex. C11, at 2573.

The District's October 29, 2015 IEP Addendum "Section 4: Functional Performance" has a section titled "Physical Therapy Notes" with a description regarding GA. Def. Ex. 17. The Petitioner's October 29, 2015 IEP Addendum "Section 4:

---

[21] Roughly a week after Lara pulled GA from the School.

[22] The District's exhibits are not clearly marked, the "Cover Sheet Signature Section" is the last page of Def. Ex. 17.

Functional Performance" does not have a section titled "Physical Therapy Notes." Ex. C11, 2575.

The District's September 10, 2015 IEP, under "Parent/Adult Student's input on Student's Current Functional Achievement" states, "She requested at the IEP Meeting that [GA] should work on functional skills at her level. Ex. 7, at 4. The Petitioner's September 10, 2015 IEP, under "Parent/Adult Student's input on Student's Current Functional Achievement" states, "She agreed that at the IEP meeting that [GA] should work on functional skills at her level." Ex. C9, at 2527.

The District's September 10, 2015 IEP, under "Skill Area: Math" has a "Standard: 01.OA.1." Dec. Ex. 7, at 6. The Petitioner's September 10, 2015 IEP, under the "Skills Area: Math" has "Standard: M00-S5C2." Ex. C9, at 2529.

The District's September 10, 2015 IEP, under the section "Accommodations" and column "Location", has rows with the letters A, E, B, and K. Def. Ex. 7, at 8. The Petitioner's September 10, 2015 IEP, under the sections "Accommodations" and column "Location" only has the letter A. Ex. C9, at 2531.

The District's September 10, 2015 IEP, under the section "Modifications" the columns for "Type" and "Location" are blank. Def. Ex. 7, at 8. The September 10, 2015 IEP, under the section "Modifications" the columns for "Type" and "Location" are filled with the number 3 and the letter A, respectively. Ex. C9, at 2531.

Glennon testified that GA's educational file is in the file room in the special education office and that GA's official record is a hard copy file. Tr. 1278:08-16. She further testified that Plaintiffs' exhibits C13 and C9 produced for the Hearing were the official records for GA and not Defendants' exhibits 7 and 32. *Id.* at 1279:01-16. Glennon verified this the next day after listening to testimony the previous day. *Id.* at 1278:23-25. If Glennon was able to "verify" this in less than 24 hours, the District should have been able to produce these documents as its official exhibits for the Hearing. One of only two options can explain this: Either the District is simply lying to save face and the documents the District produced for the Hearing are the only copies they actually had prior to the

29

hearing; or, the District attempted to create "new" versions of the records for the sole purpose of the Hearing and were caught in their fabrication. There is no middle ground.

## VIII.   THE ALJ ERRED IN FINDING THAT THE FEBRUARY 29 IEP WAS NOT THE DISTRICT'S "FINAL OFFER"

The District is bound by the IEP as written unless it sought to re-open the IEP process and proposed a different IEP. *M.C.,* 858 F.3d at 1197.

The Ninth Circuit is clear:

> Actions of the school systems cannot ... be judged exclusively in hindsight.... [A]n individualized education program ("IEP") is a snapshot, not a retrospective. In striving for "appropriateness," an IEP must take into account what was, and was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was drafted.

*Adams v. State of Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999) (citing *Fuhrmann v. East Hanover Bd. of Educ.,* 993 F.2d 1031, 1041 (3d Cir.1993)); *L.J. by & through Hudson v. Pittsburg Unified Sch. Dist.*, 850 F.3d 996, 1004 (9th Cir. 2017).

The ALJ stated:

> Petitioners asserted that some goals lacked baseline data, which rendered the goals inappropriate. While it is possible that a goal created without a baseline could be inappropriate for a particular student, the IEP is not a static document. Rather, after some time of implementation, it may be determined that a goal is too easy or too difficult for the student and the IEP Team can reconvene to develop a new goal commensurate with the student's ability.

ALJ Decision ¶ 41. (Emphasis added). The ALJ failed to cite to any case law or statute that supports her conclusion—in a footnote, the ALJ opined "Respondent School District's 'final offer' of FAPE without recognizing that the IEP is always subject to amendment as appropriate." *Id.* at 23, n. 33. Given the ALJ's conclusion, it would make filing any due process complaint futile because the "final offer" would never be a final offer -- it can just be amended at any time. After February 29, 2016, no other IEP was offered.

Additionally, the appropriateness of an IEP is not examined "in hindsight; rather, [courts] look to the [IEPs] goals and goal achieving methods at the time the plan was

implemented and ask whether these methods were [appropriately ambitious in light of his circumstances]". *Adams*, 195 F.3d at 1149; *Endrew F.* 137 S. Ct. at 1000. The ALJ's failure to consider the appropriateness of the February 29, 2016 IEP was a plain error. Further, her conclusion that the IEP could be amended even if inappropriate, is completely contrary to established case law.

IX.     **THE ALJ ERRED IN DETERMINING THAT PLAINTIFF FAILED TO ESTABLISH THE DISTRICT DID NOT ALLOW PARENT TO INSPECT AND REVIEW ANY EDUCATION RECORDS**

An LEA "must permit parents to inspect and review any education records relating to their children that are collected, maintained, or used by the agency under this part." ALJ Decision ¶ 144 (quoting 34 C.F.R. § 300.613(a); 20 U.S.C. § 1415(b)(1) (parents must be allowed "to examine all records relating to [their] child."). Additionally,

> The right to inspect and review education records under this section includes—
> (1) The right to a response from the participating agency to reasonable requests for explanations and interpretations of the records;
> (2) The right to request that the agency provide copies of the records containing the information if failure to provide those copies would effectively prevent the parent from exercising the right to inspect and review the records; and
> (3) The right to have a representative of the parent inspect and review the records.

34 C.F.R. § 300.613(b).

A.     **The District Failed to Provide GA's Education Record.**

By mandating parental involvement and requiring that parents have full access to their child's records, Congress sought to ensure that the interests of the individual children were protected. *See Rowley*, 458 U.S. at 208. Gentry testified that she turned over to the District data regarding GA. Tr., at 1207:4-13. The District did not provide Lara any data that Gentry turned over to the District. Tr., at 445:3-8. Despite multiple verbal requests, a formal written request, and the filing of a due process complaint, the District never produced GA's entire education record—instead it destroyed relevant records. On the first day of the Hearing, the District introduced an email communication between Spolsky and Cooper regarding GA that they had never produced prior to the Hearing. Tr., at 402:6-

31

04:6; *see also* Ex. A22, Ex. A20. It is undisputed that the District took steps up to and including shredding GA's documents and intentionally withholding relevant documents instead of maintaining them as required by the IDEA.

### 1.  *Intentional destruction of records.*

The IDEA requires notification to parents when a public agency destroys information containing "personally identifiable information" that is "no longer needed to provide educational services to the child." 34 C.F.R. § 300.624.[23] The Supreme Court has noted that the "IDEA thus ensures parents access to an expert who can evaluate all the materials that the school must make available, and who can give an independent opinion. They are not left to challenge the government without a realistic opportunity to access the necessary evidence, or without an expert with the firepower to match the opposition." *Schaffer*, 546 U.S. at 60–61, 126 S.Ct. at 536. Further, "[e]ven if their (referencing education records) destruction did not rise to the level of a substantive violation of the IDEA, but instead was a procedural violation of the IDEA, the Court finds their absence impedes S.F. parents' opportunity to participate in the process." S.*F. v. McKinney Indep. Sch. Dist.*, 4:10-CV-323-RAS-DDB, 2012 WL 718589, at *9 (E.D. Tex. Mar. 6, 2012), *report and recommendation adopted,* 4:10-CV-323-RAS-DDB, 2012 WL 1081064 (E.D. Tex. Mar. 30, 2012) (citing 20 U.S.C. § 1415(f)(3)(E)(ii)(II)). The "bottom line is that their destruction [prevents] parents, independent evaluators, the Special Education Hearing Officer, and even this Court from reviewing them." *Id.*

### 2.  *The District Intentionally Withheld Highly Relevant and Dispositive Emails and documents*

On November 12, 2015, Plaintiff hand-delivered a "Request for [GA's] Educational Record" (the "Record Request"). Plaintiff made twenty-five (25) distinct requests including emails. Ex. F08, at 002834-35. In response, the Defendant produced over 2000 emails and documents. Tr. at 1275:16-77:7. However, at the Hearing,

---

[23] This section of the CFR is titled "Destruction of information."

Defendant produced an email that was never previously disclosed. *Id.;* Ex. A22. During

the Hearing, Sally Glennon testified that:

> Q. You will admit that the exhibit that was marked as Exhibit
> A22 is something that you did not produce in response to the
> records request from Lara; right?
> A. Yes.

*Id.* at 1281:1-13.

The District provided documents to the Office of Civil Rights (the "OCR") in

response to the OCR's request during its investigation of Lara's OCR complaint.

Plaintiffs then submitted a Freedom of Information Act ("FOIA") request to the OCR for

those documents. In the FOIA response, it was discovered that there were at least two

emails and one timeline document that the District had not previously provided to

Plaintiffs. (Doc. 17-1, Exs. B-D, F)

> ### a)      The Norrix Email regarding GA's auditory processing evaluation

One of the documents produced in response to the FOIA request was an email from

Norrix (the "Norrix Email"), in which Norrix informed the District that "… ***I don't think***

***we have the best tools to 'diagnose' an auditory processing disorder[.]***" (Doc. 17-1, at

000009) (emphasis added). The communication with Norrix is critical. Prior to the

disclosure of the Norrix Email, Cooper maintained that "a diagnosis of APD would not

be made[,]" based upon Norrix's evaluation. Ex. C13 at 2612.

The intentionally-withheld Norrix Email prevented Lara from being fully

informed as to the District's ability to diagnose GA. Had Lara been properly informed at

that time that Norrix was incapable of diagnosing GA she would not have to wait until

May 22, 2017 for a diagnosis from Able Kids Foundation ("Able Kids"). (Doc. 17-1, at

000013.) Able Kids had the appropriate tools to test and diagnose GA's auditory

processing disorder. After conducting its evaluation of GA, Able Kids diagnosed GA with

a central auditory processing disorder ("CAPD"). *Id.*, at 000019. Able Kids recommended

that GA "wear a filter all day in her home and academic environments." *Id.* Able Kids

also recommended that "The FM auditory system should be used in all academic classes when the teacher is providing auditory information and oral directions to the class. This includes when the class is sitting as a group and when students are sitting at their individual desks." *Id.* Able Kids also recommended Hearing Protection Devices ("HPDs"), such as "earplugs or over-the-ear style muffs." (Doc. 17-1, at 000015.) The District ignores Able Kids' recommendation, and now states in Cooper's affidavit that "The District was and is willing to continue providing FM system to [GA] with or without a formal diagnosis of [CAPD]." (Doc 28-3 at 6, ¶ 23.)[24]

### b)   *Non-Disclosed Hensel Email and Timeline*

The OCR also provided to Plaintiffs a timeline produced by the District showing GA's educational activities at the School between August 4, 2015 and September 11, 2015 (the "Timeline"). The Timeline was never provided to Plaintiffs by the District. The Timeline states that the FM system was being used during whole classroom instruction. Additionally, an email was provided by the OCR from Hensel dated March 2, 2016 (the "Hensel Email"). (Docs. 17-1 at 10, 28-2). Hensel stated that GA did not participate in the Dragonflies lesson and it was above GA's ability. *Id.* In response to Spolsky's testimony at the Hearing, Hensel testified that,

> GA came in about five minutes later. And I was trying to wrap up the lesson that we were doing on dragonflies because we were going to -- half the class was going to motor lab in about 10 minutes and I needed to get it wrapped up so they could go. So I asked GA to get out her dragonfly information out of her folder.

Tr. at 1250:13-19.

Hensel now claims in her recently filed affidavit that Gentry provided GA with a modified version of the dragonflies lesson. (Doc. 28-2 at 3, ¶ 6.) At no time during the Hearing did Gentry or Hensel testify that they had modified any of GA's curriculum and

---

[24] The District also fails to state that it is willing to change the use of the FM system or use a filter. (*See* Doc. 28-3.)

the District has not produced any purportedly modified curriculum. Hensel's affidavit contradicts her testimony and other district employees' testimony and should be excluded. *See Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1473 (9th Cir. 1993).

The Hensel Email and the Timeline are directly relevant as they discuss multiple issues related to the IEPs, including curriculum, accommodations, modifications, and usage of AT devices such as the FM system. (Doc. 17-1, Exs. B-C.) The Timeline notes that the FM system should be used during "whole class instruction" the entire time GA was in Hensel's third-grade class.[25] (*Id.*, at 10 ). Hensel stated in the Hensel Email that, "The FM system was not used because I was instructed not to use it unless I was instructing [GA]." (Doc. 17-1,Ex. C.)

### c)    *Glennon's Affidavit*

The Court should disregard Glennon's affidavit, filed by the District on September 4, 2018 (the "Glennon Affidavit"). (Docs. 28-1). The Glennon Affidavit discusses the District's production of documents in this case. (*Id.*) The Glennon affidavit adds nothing to the testimony Glennon gave at the Hearing. Furthermore, the Glennon affidavit is almost entirely pure hearsay. At the Hearing, Glennon testified that District's IT person, and not Glennon, conducted the searches for documents request by Plaintiffs and reported the results of those searches. Tr., at 1275:05-76:14, 1280:19-22.

### B.    The District Changes Its Observation Policy

Under the IDEA, parental participation does not end when the parent signs the IEP. The Ninth Circuit recently emphasized that "[I]n enacting the IDEA, Congress was as concerned with parental participation in the *enforcement* of the IEP as it was in its *formation*." *M.C.*, 858 F.3d 1189. (Emphasis in original.) The Court continued: "Parents must be able to use the IEP to *monitor and enforce* the services that their child is to receive." *Id.* (Emphasis added). When a parent is unaware of the services offered to the

---

[25] The school year started on or about August 4, 2015 and Lara pulled GA out of school on September 15, 2015.

student—and, therefore, cannot monitor how these services are provided—a FAPE has been denied, whether or not the parent had ample opportunity to participate in the formulation of the IEP. *Id.*

In an email dated January 3, 2016, Lara stated that she had dropped by Daley's classroom on December 14, 2015, and that GA seemed depressed. Ex. A5, at 11. Daley's responded that she would "prefer having an appointment with parents coming into the classroom to volunteer/observe." Ex. A5 at 10. Lara requested that Daley schedule two 30-minute observations over the next six (6) weeks. Ex. A7, at 16. Daley responded that she would "pick a couple of days for you to come in in the next 6 weeks." *Id.* at 15. Notably, this email was then copied to Denise Bainton, attorney for the District. *Id.* Lara followed up on January 8, 2016, and asked whether Daley had selected days that would be OK for Lara to observe in her classroom. Ex. A8 at 16. Daley then responded "It is not my practice to have parents come in to observe my classroom." *Id.,* at 18, K 648:25-49:3 ("Our attorney, as [Glennon] has said I don't know how many times, has said we're not going to change our practice.")[26]

On January 16, 2016, Lara emailed Daley that she was "not requesting to observe your classroom. I have formally requested to perform observations on my daughter who happens to be in your classroom so that I can equally participate and make informed decisions about her education and IEP." Ex. A9. Having received no response to this email, Lara on January 23, 2016, informed Cooper that she planned to observe GA on January 26 beginning at 1:00 p.m. Ex. A11 at 32. Superintendent *Kim Sharp* responded to this email, informing Lara that she would not be scheduled to observe GA, and her name would not be added to the District's list of names for check-in purposes. *Id.* at 31. Accordingly, Lara was unable to observe GA in Daley's classroom after December 14, 2015. Given the history that Lara had with Hensel and only discovering through an

---

[26] At the January 21, 2016 IEP meeting, in response to Ballou, Glennon said repeatedly, "On the advice of our lawyer, we are continuing the practices that are in place. We are not changing." Ex. K3, at 25:21-26:1; *see also id*., at 26:21-23, 43:02-07, 43:15-17.

observation that Hensel was not only failing to follow the IEP, but she was completely ignoring GA, it was reasonable for Lara to request to observe GA in the classroom setting so she could have the ability to "monitor and enforce the services" in the IEP. *M.C.*, 858 F.3d 1189.

### C.   GA's IEPs Were Predetermined

A school district violates the IDEA if it predetermines placement for a student before the IEP is developed or steers the IEP to the predetermined placement. *W.G. v. Bd. of Tr. of Target Range Sch. Dist*. No. 23, 960 F.2d 1479, 1484 (9th Cir.1992), superseded by statute on other grounds, as recognized in *R.B. v. Napa Valley Unified Sch. Dist*., 496 F.3d 932 (9th Cir. 2007); *see also Spielberg v. Henrico Cnty. Pub. Schs*., 853 F.2d 256, 258–59 (4th Cir. 1988). Predetermination violates the IDEA because the Act requires that the placement be based on the IEP, and not vice versa. *K.D. ex rel. C.L. v. Dep't of Educ., Hawaii*, 665 F.3d 1110, 1123 (9th Cir. 2011) (citing *Spielberg,* 853 F.2d at 259*)*.

During the February 29, 2016 IEP Meeting, all the service minutes were pre-filled into the IEP. When Ballou requested that Selger increase the service time beyond the pre-filled 30 minutes, Selger stated bluntly that she "can't do that" with no other explanation. Ex. K6, 66:21-23. This is the definition of predetermination. *K.D.,* 665 F.3d at 1123 (citing *Spielberg,* 853 F.2d at 259)).

If the District discovered that the IEP did not reflect its understanding of the parties' agreement, it was required to notify Lara and seek her consent for any amendment. *M.C., 858 F.3d at 1189; See* 20 U.S.C. § 1414(d)(3)(D), (F) (discussing amendments to the IEP). Absent such consent, the District was bound by the IEP as written unless it sought to re-open the IEP process and proposed a different IEP. *Id.* During the February 29, 2016 IEP meeting, Buckley, the District's SLP recommended that GA receive sixty (60) minutes of speech and language service. Ex. K6, at 12-13. The February 29, 2016 IEP, and the District's final offer of FAPE, provided that GA would receive 30 minutes of Speech and Language Services. Ex. C13, at 2625.

**D.**   **Defective and Missing Prior Written Notices**

A public agency must give prior written notice to the parents of a disabled student whenever the agency proposes to initiate or change, or refuses to initiate or change, the student's identification, evaluation, or educational placement, or the provision of a free appropriate public education to the student. 20 U.S.C. § 1415(b)(1)(C); 34 C.F.R. § 300.503(a). That notice must not only describe the action proposed or refused by the agency, but also explain why the agency proposes or refuses to take the action, as well as the records or assessments that the agency used as a basis for its decision. 34 C.F.R. § 300.503(a) & (b).

As outlined by the IDEA, "prior written notice" includes the following:

> (A) a description of the action proposed or refused by the agency;
> (B) an explanation of why the agency proposes or refuses to take the action and a description of each evaluation procedure, assessment, record, or report the agency used as a basis for the proposed or refused action;
> (C) a statement that the parents of a child with a disability have protection under the procedural safeguards of this subchapter and, if this notice is not an initial referral for evaluation, the means by which a copy of a description of the procedural safeguards can be obtained;
> (D) sources for parents to contact to obtain assistance in understanding the provisions of this subchapter;
> (E) a description of other options considered by the IEP Team and the reason why those options were rejected; and
> (F) a description of the factors that are relevant to the agency's proposal or refusal.

20 U.S.C. § 1415(c)(1).

The PWN the District issued did not meet the statutory requirements and failed to put Lara on notice.

**X.**       **THE ALJ ERRED IN FINDING THAT THE DISTRICT CREATED APPROPRIATE IEPS**

Cooper admitted that an understanding of the child's present levels is necessary in order to develop appropriate goals for the child. Tr., at 74:23-75:5. Additionally, Cooper admitted that goals need to be measurable. *Id.* at 98:10-16. Cooper testified that the school had plenty of time to evaluate GA and provide present levels prior to the February 29,

38

2016 IEP meeting. *Id.* at 78:24-79:02. Cooper had no explanation as to why baselines were not determined. *Id.* 88:1-8; 89:9-13, 91:1-92:3. Cooper testified that the present levels and baselines were discussed at the February 29, 2016 IEP Meeting. *Id.* 91:24-92:3. However, the PWN following the meeting does not mention anything about present levels or baselines. Ex. C13, at 2627.

In addition to Cooper's testimony, expert testimony from DeLabio, M.Ed, CSP, the Director of Pathways School and Evaluation Center, confirmed that the goals in the District's February 29, 2016 IEP final offer were not measurable, were not supported by discernable present levels or baselines, and did not meet GA's individual needs. Tr., at 767:1-97:6. DeLabio testified that without present levels and without data to support any present levels, placing a child in the resource room would be a complete waste of time. Tr., at 921:2-6. The District did not dispute any of DeLabio's testimony regarding the February 29, 2016 IEP goals and whether the IEP met GA's individual needs.

**A.** **GA's Goals Were Not Reasonably Calculated to Enable GA to Make Appropriate Progress**

While GA's IEPs had goals, they were not reasonably calculated to enable GA to make progress appropriate in light of GA's circumstances. *Endrew F.*, 137 S. Ct. at 1001. DeLabio testified the goals were missing baselines throughout. Tr. 85:01 - 796:06. DeLabio testified that the goals were not measurable. *Id.* In fact, Cooper testified many of the goals were simply regurgitated versions of the same goals from year to year. Tr. 1115:14 - 1123:05. This is exactly what occurred in the *Endrew* case, and as the Supreme Court has articulated, that is not enough as it would be tantamount to "sitting idly ... awaiting the time when they were old enough to 'drop out.'" *Id.* (quoting *Rowley*, 458 U.S., at 179, 102 S.Ct. 3034).

**B.** **Inappropriate Services and Accommodations**

During the 2014-2015 school year, GA regressed in speech and language, and between September 10, 2015 through February 29, 2016, GA did not have any speech services or goals. Further, the District failed to evaluate and implement any appropriate

1   vision services for GA. Additionally, as part of GA's accommodations in her IEPs, she

2   was to "eat lunch with a buddy in a quiet area with a paraprofessional." Ex. C9, at 2531.

3   However, it was discovered that the District was having GA eat lunch in a closet.[27] After

4   expressing concern for this, the IEP Team changed this accommodation in the October

5   29, 2015 IEP and updated it to "Lunch with a buddy at picnic table or classroom with

6   paraprofessional support." Ex. C11, at 2581. However, during the hearing when Daley

7   was asked where GA ate lunch, she testified, "And then some days she would eat in like

8   I think they call it the office or *the little closet*." Tr., at 1301:24-25 (emphasis added).

9   Even after everyone agreed that GA's lunch location was inappropriate, and the IEP was

10  amended reflecting this, GA was still eating lunch in a closet.

### C.   The District Failed to Consider IEEs

12      After the November 19, 2015 MET meeting, Lara requested IEEs.  The District

13  approved and hired certain outside experts/specialists to perform the IEEs. Tr., 215:14-

14  16:3. DeLabio performed a Psychoeducation IEE, Carahaly conducted an SLP IEE, Sarah

15  Stoll conducted an Occupational Therapy ("OT") IEE, and Joyce Palmer was hired to

16  conduct an Assistive Technology ("AT") IEE. Further, at the MET Meeting, Lara

17  provided the MET team with Polec's evaluation regarding GA's vision. Ex. B6.

18      At the beginning of the February 29, 2016 IEP meeting, the District represented

19  that it was prepared to proceed with the meeting and to make an offer of FAPE to GA.

20  Ex. K6, at 6:4-9. Accordingly, during the February 29, 2016 IEP Meeting, when asked if

21  "the team has reviewed [DeLabio's] report?" Ex. K6, at 7:7. Cooper responded, "Yes."

22  *Id.* at 7:8. No one at the meeting corrected her or stated that they did not read DeLabio's

23  report. *See id.* Cooper confirmed that she considered the IEEs. Ex. K6, at 12:19-21.[28]

---

[27] *See* Ex. K3, at 123:9-24:3; *see also* Tr., at 1209:23-10:14.

[28] The District provided Lara with a meeting notice during the February 29, 2016 IEP meeting, but only after Lara specifically requested it. Ex. K6, at 5:4-11. The meeting notice did not mention anything about reviewing the IEEs. That detail was not added to the meeting notice until it was specifically requested that it be added. *Id.* 5:18-21

Despite the District's representations that it was prepared to offer GA a FAPE, the evidence establishes that key members of the IEP team had not in fact considered the IEEs. For example, Buckley stated that she had not fully considered the speech and language IEE, "*No, I just got the report.*" *Id.* at 12:22-24 (emphasis added). Notwithstanding the lack of review of Carahaly's report, Buckley copied verbatim one of Carahaly's goals from her IEE report. Exs. C13, at 2620; B5, at 2334. Carahaly testified that the goals in her report were not designed to be copied verbatim. Tr., at 628:2-29:10.

In addition, Selger, the District's OT, stated during the February 29, 2016 IEP meeting that she had not seen GA's vision report, although the District had that report for months. Ex. K6, at 87:6-19. As previously discussed, Lara gave the MET team a copy of GA's vision report from Polec during the MET meeting on November 19, 2015. Ex. K4:90:2-14. It is undisputed that at least Buckley, Daley, and Selger did not review the IEEs. Tr., at 1312:24-13:4. Daley also stated during the February 29, 2016 IEP meeting, that she "has not reviewed [GA's] entire file." Ex. K6, at 19. This is alarming as GA had been in Daley's class since November 2015.

While the District retained an AT Consultant to prepare an IEE, Tr., at. 133:1-6. the District never disclosed any AT IEE Report[29] and the AT Consultant did not attend the February 29, 2016 IEP Meeting. Ex. K6, at 3:20-25. At the February 29, 2016 IEP Meeting the District represented that the AT report was not finished.[30] *Id.*, at 4:1-3. Nonetheless, they made recommendations for AT, including the use of the ***magnifying strips***. *Id.*, at 82:9-83:24. The Final Offer of FAPE from the District included AT devices

---

[29] Cooper testified that she had actually read the AT consultant's report. Tr., at 133:6-18, 134:21-35:10. However, no copy was provided to GA nor was it disclosed as one of the District's exhibits.

[30] A student's (IEP) was not sufficiently individualized with respect to her AT evaluation, as required to provide student FAPE under IDEA, where admissions, review, and dismissal (ARD) committee required school district to complete AT evaluation for student, but district failed to present evaluation to ARD committee or incorporate evaluation into student's IEP. 1401(2)(A). *R.P. ex rel. R.P. v. Alamo Heights Independent School Dist.*, 703 F.3d 801 (5th Cir. 2012); 20 U.S.C.A. §§ 1400(d)(1)(A).

and services. Ex. C13, at 2618. Further, as part of the Related Services in the IEP, it included "AT- Writing Software/apps" "AT reading software apps," and "AT graphic organizer software/apps" *Id.*, at 2625. But, there was no discussion about any of these items at the February 29, 2016 IEP Meeting. *See* Ex. K6. Despite Cooper's testimony, the District has never produced an AT report. This prevented Lara from participating in the IEP process.

Despite all of this, the District confirmed that the February 29, 2016 IEP was the District's final proposal of FAPE for GA. Ex. K6, 150:12-15, 16-17.

## XI.   THE ALJ ERRED IN FINDING THAT THE DISTRICT PROPERLY IMPLEMENTED GA'S IEPS

The Ninth Circuit has stated, "One of the IDEA's most important mechanisms for achieving these lofty goals is the formulation and ***implementation*** of IEPs." *Van Duyn ex rel. Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 818 (9th Cir. 2007). (Emphasis Added). The IDEA's plain language indicates that a failure to implement an IEP may deny a child a FAPE, and thereby, gives rise to a claim under the statute. *Van Duyn*, 502 F.3d at 821.

### A.   Observations of Failure to Implement

Pursuant to GA's IEPs in effect at the beginning of the 2015-2016 school year, Spolsky provided 30 minutes of services to GA per week. Spolsky testified that these services consisted primarily of monitoring the FM system and the use of the FM system in GA's regular education classroom. Tr., 363-64. At that time GA's third-grade teacher in the regular education classroom was Hensel.

GA's September 11, 2014 IEP specified accommodations for GA, including "Use preferential seating," "Use manipulatives," and "Provide visual cues." Ex. C6 at 2496. GA's September 10, 2015 IEP contained similar and even more extensive accommodations for GA, including: "Provide a consistent daily routine," "Use preferential seating," "Adjust level of questioning," "Use manipulatives/visual models," "Read aloud to students," and "Allow student ample response time." Ex C9 at 2531. That

1  IEP also included certain modifications of the curriculum to be made for GA, including

2  but not limited to "*Simplified curriculum* (limit the number of concepts, knowledge, or

3  skills to be mastered and assessed.).". *Id*. Emphasis added.

4      On September 11, 2015, Spolsky observed that the FM transmitter was not being

5  used; that GA's desk was not next to Hensel's; that GA was not facing the teacher; GA

6  was not provided visuals cues; and, that GA was merely "*sitting there playing with*

7  *paperclips during the lesson*" despite the lesson being a science lesson about "butterflies

8  or dragonflies." *Id.;* Tr., at 384:9-85:1. (Emphasis added). Spolsky also observed Hensel's

9  students in the motor lab with the motor lab teacher. Tr. p. 385-86. She observed that

10  GA's motor lab teacher was confused by what the FM system was and its purpose – nearly

11  40 days into the school year. *Id*. at 386:7-17.

12      After Spolsky made these observations, she sent an email to Lara discussing her

13  observations. Ex. A20. She considered the email to Lara "just another communication

14  with a parent." Tr., at 385:16-17. Spolsky also had a telephone conversation with Lara on

15  September 11, 2015, in which she also discussed her observations with Lara. Tr. at

16  260:21-61:10, 261:1-12. Lara immediately called Centers to relate what Spolsky had told

17  her, and to tell Centers that she needed to observe GA at school. *Id.,* at 261-62. Centers

18  was agreeable to Lara observing GA beginning the following Monday, September 14,

19  2015. *Id*. at 262. Lara observed GA at the School the entire school day on September 14,

20  2015. *Id.* Lara testified that she observed that GA's desk was angled away from the

21  whiteboard and Promethean board and that no accommodations were being made for GA

22  in Hensel's classroom. Tr., at 262:25-63:19.[31]

23

24

_____

25  [31] Apparently, the FM system became broken at some point on the afternoon of September
14, 2015 when it was dropped during adaptive PE. Tr., at 263:22-64:2. Lara testified that
26  she had seen Hensel using the FM system "a little bit but not consistently" earlier in the
day. *Id.* at 265. Of course, by then the District would have had the opportunity to alert
27  Hensel to Spolsky's observations and concerns which Lara had relayed to Centers the
28  previous week.

43

1    Lara returned to observe GA for a half-day on September 15. *Id.* at 265:16. Lara

2    testified that she followed GA to motor lab, and spoke with GA's motor lab teacher. *Id.*

3    at 265:21-66:18. Lara testified:

4           A. …. So when I came in on the 15th and [GA] had motor lab
            again, the FM system was broken at that time. I observed the
5           motor lab session. And then at the end I asked [the motor lab
            teacher] if she knew anything about my child and she said no.
6           I said you don't know that she has epilepsy? And she said no.
            And I said, I asked her the same thing about the FM system.
7           I said up until Dr. Spolsky had been there on that previous
            Friday had she used it? And she said no.
8

9    Tr., at 266:10-18.

10   Lara also observed GA in the resource room. Tr., at 267:16-20. Although Gentry

11   had provided Lara with a detailed schedule indicating that GA was to report to the

12   resource room at 9:00, Hensel sent GA to the resource room at 8:30. *Id.*, at 267:12-21.

13   Lara testified that "it just seemed thrown together, almost as if they were trying to put it

14   together since they knew I was going to be there." Tr., at 268:7-16.

15   On the evening of September 14, 2015, Cooper sent Spolsky an email regarding

16   GA's "participation and FM system in the classroom." Ex. A22, at 2. Spolsky responded

17   to Cooper via email the following morning:

18          So…last Friday was the first time seeing GA working with
            Ms. Hensel. What I saw that was concerning: ***the FM was***
19          ***turned off on the teacher's desk and was not being used***. GA
            was sitting quietly but was not engaged in the lesson (reading
20          about dragonflies) and was not encouraged or admonished to
            participate or at least attend to the lesson. If the FM had been
21          used, GA would have had that signal to noise ratio reduced
            and she could have at least followed the reading if anything,
22          through incidental listening. Ms. Hensel told me herself that
            she would not have the FM passed around for kids to use and
23          to me, it is beneficial to again continue that reduction in signal
            to noise ratio for GA to have spoken language input without
24          disruptions and would also allow her more access to what is
            happening in class. My concerns are: ***FM not being used***, GA
25          not being engaged, and ***no modification of curricular***
            ***lessons/activities***. I have always made myself available as a
26          resource and am troubled to see a child not engaged in
            learning during the school day.
27

28

44

1
2
3

*Id.* at 1. (Emphasis added). In reply, Cooper thanked Spolsky for the information, and specifically asked Spolsky whether Spolsky felt "comfortable working with GA to do modification, model ways of involving GA in the class, getting the FM system, etc." *Id.*

4
5
6

In response, Centers admonished Spolsky for "open[ing] a can of worms that did not have to be opened." Tr., at 388:24-89:2. Centers informed Spolsky that Centers "would be more than happy to write [Spolsky] up." *Id.*, at 389:15-16.

7
8
9
10
11
12
13
14
15
16
17
18

Lara removed GA from the School on September 16, 2015, and immediately called for an emergency meeting of the IEP team. Tr., at 269:23-70:1. The meeting occurred on September 18, 2015. Ex. K1. At the meeting, Hensel admitted that both she and Gentry had concluded that GA was not capable of doing third-grade work. Ex K 1 at. 12-13. "I cannot modify enough in the classroom for" GA. *Id.* at 12:2-4. Hensel also stated that in her opinion, "Modifying third-grade material will not help [GA] progress from where she is at." *Id.* at 12:12-14. Hensel testified at the hearing that she also did not believe GA should have been returned to Second-Grade. Tr., at 1264:19-21. At the emergency meeting, Lara explained to the IEP Team about what Spolsky observed and what she herself had observed regarding GA in the education setting. *See* K 1. At the meeting, Lara requested a new teacher. Centers said that Daley might be a possibility, but she needed to consider the ratios. Tr. at 274:16-20.

19
20
21
22

GA was simply warehoused in Hensel's classroom – "sitting idly … awaiting the time when [she was] old enough to 'drop out.'" *Endrew F.,* 137 U.S. at 999.[32] Acknowledging that GA could not continue in Hensel's class, the District agreed to place GA in a classroom taught by a different third-grade teacher. Ex. A20, at 1433. The District

23
24
25
26
27
28

---

[32] Vengelen testified that she felt Hensel was not going to do as much as was going to be necessary. Tr. at 169:1-8. Further, Vengelen testified that there was one time when GA walked past her and had her head down. *Id.* at 170:6-8. Vengelen asked if she was ok and GA did not even look at her. *Id.* at 170:8-9. Hensel also told Vengelen that GA just copies and cannot do the work and Hensel seemed frustrated. *Id.* 170:20-71:6.

did not actually line up a teacher for GA until October 10, 2015—roughly a month after Lara pulled GA from Hensel's class. Ex. A20 at 1433.[33]

On September 20, 2015, Glennon sent an email to Kim Sharp alerting Sharp of the situation with GA. Glennon informed Sharp that the parents complained that GA's FM system was not being used properly, that the curriculum was not being modified for GA, and that GA was being ignored in  Hensel's classroom. Ex. A20, P. 1228-29. Glennon acknowledged that the curriculum had not been modified for GA as required by GA's IEP: "Regarding the curriculum modifications, Jayne [Cooper] and Debbie [Gentry] said that after the IEP meeting the previous week they agreed that would happen. They had not yet had time to do the modifications but would do better." *Id.* at 1228

Glennon blamed Spolsky for allegedly failing to properly instruct Hensel on the use of the FM system. *Id.* at 1229. However, the evidence at the hearing demonstrates that Hensel had no interest in using the FM system and affirmatively resisted its use.[34]

After GA returned to the School at the end of November 2015, Lara again sought to observe GA in the classroom. As an IEP team member Lara's personal observations were necessary to enable her to make informed decisions regarding GA's education and be about to monitor and enforce the IEP. *M.C.,* 858 F.3d 1189. In this case, such personal observation was absolutely critical to parent participation in the IEP process given the District's history of refusal to follow GA's IEPs, disregard of the FM system, and the fact that the District's only HI Teacher – Spolsky – left the District on December 20, 2015 and was not replaced. Tr. at 389:19-20.

---

[33] It took the District until November 20, 2015, to provide Lara with the final version of the October 29, 2015 IEP Addendum so that GA could return to school. Tr. 287:4-25.

[34] Spolsky testified, and her numerous emails document in detail, that she had reached out to Hensel repeatedly in an attempt to educate Hensel on the proper use of the FM system. Hensel simply ignored Spolsky. Ex. A20, at 732, 740, 808-09; Tr., at 371:2-22. On the one occasion in which Spolsky was able to speak, briefly, with Hensel, Hensel acted blasé about the system and expressed to Spolsky that she did not think the FM system worked or was helping. Tr., at 387:12-19. As noted above, Hensel also refused to pass it around to the children in her classroom. Ex. K1, at 34:2-7.

**B.**   **The District Failed to Document GA's Progress**

Beginning with GA's September 2013 IEP, the District was required to document and collect data regarding GA's progress. Exs. C, at 2422-24; C6, at 2485-87; C9, at 2529-30; C11, at 2578-80. Lara made numerous requests, including a formal written records request, for documentation regarding GA's progress. Ex. F8, ¶ 9. The District failed to provide Lara or otherwise produce *any* documentation of data regarding GA's progress. This resulted in a denial of FAPE.

Additionally, during the February 29, 2016 IEP meeting, the District stated that it did not have any data on any of GA's goals for the 2015-2016 school year. Ex. K6, at 141:18-42:10, 143:3-8.

**C.**   **The District Provided Its Teachers With Only Summary IEPs**

Once an IEP has been developed, the agency must ensure that the IEP is accessible to each teacher or service provider who is responsible for implementing any aspect of the student's program. 34 C.F.R. § 300.323(d)(1). The agency must inform every teacher or provider named in an IEP about his or her specific responsibilities and the accommodations, modifications, and supports that the IEP requires for the student. 34 C.F.R. § 300.323(d)(2).

Vengelen testified she received only "a summary IEP" that included only "the goals and the things that I need to, the modifications that I need to make in the class." Tr., at 144:19-23.

**D.**   **The District Failed to Train Its Staff**

The Supreme Court has stated, "Congress plainly required schools to hire various specially trained personnel to help handicapped children, such as 'trained occupational therapists, speech therapists, psychologists, social workers and other appropriately trained personnel.'" *Indep. Sch. Dist. v. Tatro*, 468 U.S. 883, 893, 104 S. Ct. 3371, 3377(1984) (citation omitted). The D.C Circuit, relying on *Tatro,* stated, "schools may still be required, pursuant to a child's IEP, to train personnel to perform routine monitoring of the external components of ... acoustical hearing aids as well as to hire or retain specialists to

provide other supportive audiology services 'such as speech and language therapy, assistive listening devices, appropriate classroom acoustics, auditory training, educational interpreters, cued speech transliterators, and specialized instruction.'" *Petit v. U.S. Dept. of Educ.*, 675 F.3d 769, 787–88 (D.C. Cir. 2012) (quoting Final Regulations, 71 Fed.Reg. at 46, 570); *Light v. Parkway C-2 Sch. Dist.*, 41 F.3d 1223, 1230 (8th Cir. 1994) (School districts must take reasonable steps to train and prepare a student's teaching staff.).

The September 10, 2015 IEP stated, "A meeting is to be held before the first day of school for students for all staff who will be working with GA to be trained on the use of her FM system. GA's parents and ***all team members*** are to be present." Ex. C9., at 2534 (emphasis added). It is undisputed that the District did not holding this meeting required by the IEP until November 4, 2015.[35] Ex. K7. Spolsky testified that Hensel was unresponsive to her emails regarding the FM system. *Id.* at 377:9-78:21. It was not until August 4, 2015, that Spolsky met with Hensel and had a very brief training session for the FM system. *Id* at 378:5-20. GA was enrolled in the District for ***over two years*** before all of her teachers and various service providers were provided formal training on how to use her assistive technology and how to address her medical issues.

### E.    The Improper Use of Employees as Support

According to the October 29, 2015 IEP Addendum, GA was to receive paraprofessional services for 120 minutes per day. Exs. C11, at 2584; K3, at 160:3-23. The September 11, 2014 IEP states that a SLP or SLP-A would be providing speech and language service minutes for GA. Ex. C, at 2491. However, Buckley admitted that the aide providing at least half of GA's speech services during the 2014-2015 school year was not even an SLPA. Tr., at 1154:12-53:2.  *See* also Ex. K6, 39:15-40:10. Failing to have qualified individuals providing service minutes to GA resulted in a loss of educational benefits.

---

[35] Even Jill Vengelen, who used the FM system with GA in second grade, was never provided training on GA's medical needs or the FM system. Tr., at 156:15-25.

The ALJ actually awarded service minutes based on the fact that an unqualified person was providing GA's speech services. *See* ALJ Decision ¶ 135. The ALJ nonetheless stated that GA was not denied a FAPE. *Id.* ¶ 139.

## XII.     IEP MEETINGS

Members of the IEP Team are required to attend all team meeting unless the parents and the public agency jointly agree that a member's attendance is not necessary because his or her area of the curriculum or related services is not going to be modified or discussed at the meeting. 20 U.S.C. § 1414(d)(1)(C)(i); 34 C.F.R. § 300.321(e)(1). If the meeting is going to involve modifications to or discussion of the member's area of services, that member may be excused only if the parents and agency jointly agree and if the member submits written input about the development of the student's IEP to the parents and the rest of the IEP Team before the meeting. 20 U.S.C. § 1414(d)(1)(C)(ii); 34 C.F.R. § 300.321(e)(2). In either of these situations, the parents' consent to the team member's absence must be in writing. 20 U.S.C. § 1414(d)(1)(C)(iii); 34 C.F.R. §§ 300.321(e)(1), (e)(2)(i).

### A.     Failure to Include Proper Participants

The Ninth Circuit has "held that the failure to include 'the teachers most knowledgeable about [the child's] special educational levels and needs" was a violation of the IDEA. *M.L. v. Fed. Way Sch. Dist.*, 394 F.3d 634, 645 (9th Cir. 2005) (quoting *Shapiro ex rel. Shapiro v. Paradise Valley Unified Sch. Dist.,* 317 F.3d 1072, 1076-77 (9th Cir. 2003) *superseded on other grounds by* 20 U.S.C. § 1414(d)(1)(B)).

The Supreme Court reiterated that a school district "cannot limit educational access simply by pointing to the limitations of existing staff." *Cedar Rapids Cmty. Sch. Dist. v. Garrett F.*, 526 U.S. 66, 76 n.8 (1999). The IDEA requires schools to hire specially trained personnel to meet disabled student needs. *Tatro*, at 893, 104 S.Ct. 3371.

As discussed herein, Spolsky left her position in December 2015. The District never replaced her and did not have an HI Teacher present at the February 29, 2016 IEP Meeting. Nevertheless, the use of the FM system was changed without any discussion.

1     As discussed herein, the AT consultant was not present at the February 29, 2016

2  IEP meeting nor was her report complete. However, the District made recommendations

3  for AT in their final offer of FAPE on February 29, 2016.

**XIII.     THE ALJ ERRED IN FINDING THAT PRIVATE PLACEMENT AT PATHWAYS WAS NOT PROPER**

     A private school is "proper" so long as the school the parent selected "provides educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction." *C.B. ex rel. Baquerizo v. Garden Grove Unified Sch. Dist.,* 635 F.3d 1155, 1159 (9th Cir. 2011) (internal quotation marks and citation omitted). This standard is met even if the private school provides "some, but not all" of the students educational needs; the placement need not "maximize the[ ] child's potential." *Id.* (internal quotation marks, citation, and italics omitted). [36]

     In considering whether the District proposed an appropriate placement for GA, the Court must balance four factors: "(1) the educational benefits of placement full-time in a regular class; (2) the non-academic benefits of such placement; (3) the effect [Student] had on the teacher and children in the regular class; and (4) the costs of mainstreaming [Student]." *Sacramento City Uni. Sch. Dist., Bd. of Educ. v. Rachel H.,* 14 F.3d 1398, 1404 (9th Cir. 1994). "This analysis directly addresses the issue of the appropriate

---

[36] Parents need not meet the "least restrictive environment" test in demonstrating that a private placement is proper under the IDEA. *See, e.g., Rome Sch. Comm. v. Mrs. B.,* 247 F.3d 29, 33 n. 5 (1st Cir. 2001) (propriety of a unilateral placement "is a different issue, and one viewed more favorably to the parent, than the question whether this residential placement was required in order to provide a free appropriate education to DC."); *Warren G. ex rel. Tom G. v. Cumberland Cnty. Sch. Dist.,* 190 F.3d 80, 84 (3d Cir.1999) (agreeing that "imposition of the least-restrictive environment requirement on private placements would vitiate the parental right of unilateral withdrawal"; noting, "An appropriate private placement is not disqualified because it is a more restrictive environment than that of the public placement."); *Babb ex rel. Babb v. Knox Cnty. Sch. Sys.,* 965 F.2d 104, 108 (6th Cir.1992) (same).

1    placement for a child with disabilities under the requirements of 20 U.S.C. § 1412(5)(B)."

2    *Id.*

3            In April 2016, GA enrolled in Pathways. Pathways is a non-profit state-approved

4    private day school that receives all its funding from donations and tuition[37]—it does not

5    receive federal funding. Tr., at 73:19-20, 688:13-14. The Tucson campus, attended by

6    GA, sits on 2.1 acres, includes three picnic ramadas, an enclosed courtyard with a paved

7    patio and shade screen, and a very large play structure with a shade screen. Tr. At 831:7-

8    10. The school has three classrooms, two smaller spaces, sensory room, OT room, speech

9    and language room and another small room for small group instruction. *Id.,* at 831:1-5.

10   The walls are deliberately plain and boring. *Id.* At 831:17-18. There is no clutter on the

11   walls and they are painted an off-white in order to support students' attention and focus.

12   *Id.*

13           Pathways has a 5:1 student to teacher ratio with a combination of master teachers

14   and qualified paraprofessionals. *Id.* Many of Pathways' teachers are special education

15   certified. *Id.,* at 796:25-97:2. Pathways also employs teachers with general education

16   certifications. *Id.* The teachers that deliver the primary instruction and content are trained

17   in particular programs such as Wilson reading or other reading programs. *Id.* at 796:14-

18   21. The school groups children in multiple age ranges including: kindergarten through

19   third-grade, fourth through sixth, and seven and eighth grade. *Id.* The students are divided

20   up into small groups based on their skill sets, their needs, and their IEP goals. *Id.*

21           There are computers in each classroom and the kindergarten through third-grade

22   group has a very large touch screen. *Id.* 836:1-3. The upper school grades have three

23   computers, a laptop, and an iPad. *Id.*, at 836:5-6. Additionally, each of the SLPs and

24   SLPAs all have an iPad that they use for instructional purposes. *Id.,* at 836:10-12.

25

26

27

28   [37] Tuition is $25,000 per year at the Tucson location. Tr., at 835:19-20.

1  Pathways is able to offer curriculum through its computers including a keyboarding class

2  when GA attends.[38] *Id.*, at 836:12-8.

3        As DeLabio explained, Pathways uses SPIRE, Lindamood-Bell Seeing Stars,

4  Lindamood-Bell LipS, and Read Live to address GA's reading needs. *Id.* at 826:13-23.

5  Additionally, Pathways uses Montessori math curriculum. *Id.* 814:3-4.

6        DeLabio testified that GA has progressed socially, emotionally, academically,

7  functionally, and that GA has made "tremendous improvements." *Id.* at 840:18-41:1.

8        Moreover, GA's Progress reports and narratives demonstrate that GA has been

9  improving in reading, written expression/language arts, math, occupational therapy –

10  including vision, and GA is making progress on all of her goals. *See* Ex J, 2, 3, 6, 9.

11        DeLabio discussed each goal listed in GA's IEP at Pathways. She explained the

12  present levels and the baselines, and ultimately believed that the goals were appropriate

13  and addressed GA's individual needs.[39] Tr. at 811:12:18:6. The District did not dispute

14  any of Pathways' present levels, baselines, goals, nor their appropriateness. In fact, upon

15  being questioned regarding GA's goals and her cognitive ability score of 88, Cooper

16  testified that GA's math goal at Pathways was a good goal for her. Tr., at 1059:18-60:9.

17        **A.    GA's Auditory Processing and Vision Have Improved While She has**
          **Attended Pathways**
18

19        Carahaly performed two evaluations, dated January 14 and 15, 2015, and February

20  4, 2017, respectively of GA's auditory processing. Exs. B5; E35; Tr., at 637:3-20.

21  Carahaly testified that the results of these evaluations showed that GA auditory

22  processing had improved. Tr., at 642:2-6. Thomas testified that she performed a follow-

23  up evaluation of GA vision in September 2016, and that GA visual skills had improved

24  ―――――――――――――――――

25  [38] At the February 29, 2016 IEP Meeting, Selger of the District wrote off any possibility
     that GA would ever be able to keyboard. Ex. K 6, 65:3-66:23.

26  [39] It may appear that two of DeLabios' goals did not have a baseline. But she testified that
27  she did have a document in GA's cumulative file that had baselines for both the goals. Tr.
     at 932:3-12.

28

during the time she was attended Pathways. Tr., at 672:14-20. Thomas testified that DeLabio consulted her when developing GA's goals. *Id.* at 673:3-7, 677:25-78:12.

## XIV. <u>REIMBURSEMENT OF EXPENSES AND PLACEMENT</u>

If a parent decides to enroll the child in a private school without a referral by the public school, an administrative hearing to obtain reimbursement for private school costs can be requested. 20 U.S.C. 1412(a)(10)(C)(ii). As long as an educational benefit for the child has been provided, *Florence County School Dist. Four v. Carter By and Through Carter*, 510 U.S. 7, 114 S. Ct. 361 (1993), the placement does not have to be in a state-approved facility. *Id.*

Parents are entitled to reimbursement for the costs of placement or services they have procured for their child when: (1) the school district failed to provide a FAPE; and (2) the private placement or services procured are (a) proper under IDEA and (b) reasonably calculated to provide educational benefit to the child. 20 U.S.C. § 1412(a)(10)(C); *School Committee of the Town of Burlington v. Dept. of Education* (1985) 471 U.S. 359, 369-370; *Student W. v. Puyallup Sch. Dist*. 31 F.3d 1489, 1496 (9th Cir. 1994). Parents must only provide a placement or services that address the student's needs and provides the student with an educational benefit. *Florence County Sch. Dist., Four v. Carter* 510 U.S. 7, 13, 114 S.Ct. 361 (1993); *Alamo Heights Indep. Sch. Dist. v. State Board of Educ*. 790 F.2d 1153, 1161 (5th Cir. 1986).

The Court has further explained that reimbursement for such expenses is appropriate *only* if (1) the school district's placement violated the IDEA, and (2) the alternative placement was proper under the statute. *Anchorage Sch. Dist. v. M.P.*, 689 F.3d 1047, 1059 (9th Cir. 2012 *(*citing *Florence Cnty. Sch. Dist. Four v. Carter,* 510 U.S. 7, 15, 114 S.Ct. 361, (1993)).

GA has incurred the following expenses due to the District failing to provide her with a FAPE:

- Private tutor: $1140. Ex. L15
- Vision evaluation $345 Ex. L4

- Vision therapy: $2,431 Ex. L18
- Pathways tuition including ESY: 87,907.50. Exs. L1 3, 11, 12; Tr., at 835:19-20.[40]
- Mileage to and from Pathways. Ex. L10
- Rental House: $8,409. Ex. L17
- AT Evaluation: $100. Ex L9
- Feeding Specialist: $150 Ex. L6
- Hotel for IEE:  $241.40 Exs. L7, 8
- Reading and Education therapy: $2,175 L16
- Pediatric Therapy Solutions: $394.53. Ex. L2
- Able Kids Foundation: $915.08.

**XV.**     **THE ALJ ERRED IN FINDING THAT GA WAS NOT DENIED A FAPE WHEN THE DISTRICT FAILED TO OFFER AND PROVIDE ESY**

The U.S. Department of Education has determined that the provision of a FAPE must sometimes require services to be continued beyond the traditional 180-day school year. 34 C.F.R. § 300.106(a)(1). These "extended school year" or "ESY" services are defined as special education and related services that are provided to a disabled student beyond the public agency's normal school year, in accordance with the student's IEP, at no cost to the parents, and in compliance with the state educational agency's standards. 34 C.F.R. § 300.106(b).

A claimant must show that "an ESY is necessary to permit [the child] to benefit from his instruction." *Id.* (internal quotation marks omitted) (alterations in original). Claimants can rely on expert opinion testimony to make this showing and are not required to present empirical proof of actual prior regression. *N.B. v. Hellgate Elementary Sch. Dist., ex rel. Bd. of Directors, Missoula County, Mont.*, 541 F.3d 1202, 1212 (9th Cir. 2008) (citing *Cordrey v. Euckert*, 917 F.2d 1460, 1471-72 (6th Cir. 1990).

Carahaly testified that due to the severity of GA's disabilities there would be regression over extended periods of time making her an excellent candidate for ESY services. Tr. at 619:01-8; *see also* Ex. B5, at 2333 ("[GA] is also an excellent candidate for Extended School Year (ESY) services as the severity of her disability is significant.

---

[40] GA is still enrolled at Pathways.

1   These speech and language skills must be maintained without interruption. There is a

2   significant concern regarding skill maintenance during a break in services.")

3   Additionally, DeLabio testified that "consistency and frequency of therapy is important

4   to [GA]" *Id.* at 619:8-9. The District did not dispute DeLabio's testimony nor did they

5   present any evidence to rebut GA's apparent regression.

6         Additionally, Venegelen testified that, "after two years of second-grade I felt she

7   would be ready to move to third-grade." Tr., at 161, 11-16. However, when GA started

8   third-grade in August 2015,[41] and as discussed herein, Hensel believed that she could not

9   modify enough in the classroom for GA nor did she believe that GA was able to perform

10  at the 3rd grade level. Ex. K1, at 12:3-4, 13-14; 12:20-13:6.

11  ## XVI.        THE ALJ ERRED IN NOT SHIFTING THE BURDEN TO THE DISTRICT

12

13        Normally, the party alleging a violation of the IDEA bears the burden of showing

14  that the services received amounted to a denial of a FAPE.  *Schaffer ex rel. Schaffer v.*

15  *Weast*, 546 U.S. 49, 57–58 126 S. Ct. 528 (2005). A recently decided Ninth Circuit held:

16        If parents don't know what services are offered to the
          student—in kind or in duration—it's impossible for them to
17        assess the substantive reasonableness of those services. In
          such circumstances, ***the burden shifts to the school district***
18        ***to show that the services the student actually received were***
          ***substantively reasonable***.
19
    *M.C.,* 858 F.3d 1189 (emphasis added).
20
          Here, there are multiple undisputed procedural violations that deprived Lara of the
21
    knowledge of services offered and provided to GA.
22
          The District unilaterally changed the September 10, 2015 IEP, the October 29,
23
    2015 IEP, and the February 29, 2016 IEP. In the September 10, 2015 IEP, the District
24
    removed GA's category of eligibility for speech and language, removed all speech and
25
    language services, and removed all the speech and language goals.
26

27  _____

28  [41] GA did not receive ESY services for summer 2015. Ex C 6, at 2468.

As discussed herein, in the October 29, 2015 IEP, the District unilaterally removed all math, reading, and writing services (450 minutes total), and also failed to include any speech and language goals and services that were removed in the previous IEP. Moreover, the District unilaterally entered a total of 60 minutes of consultative services for "general education classroom" provided by the "sped teacher" and the "SLP". Ex. C11, at 2584. The October 29, 2015 PWN stated, "SPED teacher will be available for consult with regular education teacher as determined by teacher." *Id.* Troublingly, the PWN does not list the removal of any goals or any services. *See Id.*

In the February 29, 2016 IEP, the District only offered 30 minutes of speech and language services. However, in the February 29, 2016 IEP meeting, Buckley suggested 60 minutes at the IEP meeting, but in the final offer of FAPE the District only offered 30 minutes, Further, the District offered AT services despite the AT consultant not being at the meeting and without a complete AT report. Additionally, the AT writing, reading, and graphic organizers were not discussed at the final IEP meeting on February 29, 2016.

The unilateral changes to the IEP resulted in Lara not knowing what services were being offered or provided to GA. The burden has shifted to the District to prove that the services that were offered and actually received were substantively reasonable. *M.C.,* 858 F.3d 1189. The District did not present any evidence that any of the goals and services were substantively reasonable. Thus, there District failed to meet its burden and GA was denied a FAPE.

**XVII.      <u>FAILURE TO RESPOND TO THE COMPLAINT</u>**

The District failed to address Plaintiffs' claims that Pathways is the proper placement for GA in their Response. *See.* Resp to Compl. The Ninth Circuit recently addressed a similar issue regarding a respondent's failure to respond a complaint. The court stated:

Like an answer to a complaint, a response serves an important dual purpose: It gives notice of the issues in dispute and binds the answering party to a position." *See, e.g.*, *United States* v. *All Assets Held at Bank Julius Baer & Co.*, 959 F. Supp. 2d 81, 116

n.21 (D.D.C. 2013) (noting that "one function of an answer" is to identify "points of disagreement"); *Lopez* v. *U.S. Fidelity & Guaranty Co.*, 18 F.R.D. 59, 61 (D. Alaska 1955) (explaining that the purpose of rules governing answers to a complaint "is to prevent surprise"). Failure to file a response puts the opposing party at a serious disadvantage in preparing for the hearing, as it must guess what defenses the opposing party will raise. The problem is particularly severe in IDEA cases because there is no discovery. *M.C.,* 858 F.3d 1189.

The *M.C.* court recognized for the first time in an IDEA case that it will defer to the Federal Rules of Civil Procedure to address pleading issues. *Id.* Fed. R. Civ. P. 8(b)(6) provides, "An allegation—other than one relating to the amount of damages—is admitted if a responsive pleading is required and the allegation is not denied."

Here, the Plaintiff filed a 401-paragraph complaint alleging numerous violations under the IDEA. *See* Due Process Compl. The District filed an eight (8) paragraph response. *See* Resp. to Compl. Since the District failed to address the majority of the Plaintiffs' complaint, each allegation the District has failed to deny should be deemed admitted.

## XVIII.        <u>CONCLUSION</u>

For the foregoing reasons, this court should find the District violated IDEA and failed to provide a FAPE for GA. Each prayer for relief the Plaintiffs request should be granted: reimbursement for private assessments; round trip reimbursement for all transportation to all previously paid IEEs and future IEEs; reimbursement for all privately paid educational and therapeutic services and tuition incurred from September 2015 to the present day, and round trip transportation to these services; revision of GA's IEP to include goals and objectives in all necessary areas after the appropriate assessments have been conducted in order to continue in General Education placement with appropriate therapies and support.; placement and supports that appropriately addresses GA's unique needs; appropriate speech and language services based on an appropriate assessment; appropriate occupational therapy and adaptive physical education or physical therapy

services based on an appropriate assessment; provision of academic support to ensure GA meets grade level standards; compensatory education, services, and relief for the failure to provide GA with an appropriate program since April 2014 and as set forth herein; placement and funding of GA at a Private Day school with support for the 2016-2017 school year and all subsequent school years and ESY; a declaration that the present private placement of GA at Pathways is necessary in order for the District to provide a FAPE to GA pursuant to the IDEA, 20 U.S.C. §§ 1400, *et seq.*; an award of reasonable attorney's fees, costs, and disbursements expended in this matter both in the administrative hearing and in this action pursuant to 20 U.S.C. § 1415(i)(3)(B)(i)(I); and for any other and further relief the hearing officer deems equitable and appropriate. Compl. ¶¶ 389-401.

**RESPECTFULLY SUBMITTED** this 21st day of September 2018.

By   /s/ Sean A. Woods
      Robert T. Mills
      Sean A. Woods
      Jordan C. Wolff
      5055 North 12th Street, Suite 101
      Phoenix, AZ  85014
      *Attorneys for Plaintiffs*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on September 21, 2018, I electronically transmitted the foregoing document to the Clerk's Office using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Denise M. Bainton
Sesaly O. Stamps
DECONCINI MCDONALD YETWIN & LACY, P.C.
2525 East Broadway Blvd., Suite 200
Tucson, AZ 85716-5300
*Attorneys for Defendant*


        /s/ Jordan C. Wolff