Robert T. Mills (Arizona Bar #018853)
Sean A. Woods (Arizona Bar #028930)
Jordan C. Wolff (Arizona Bar #034110)
**MILLS + WOODS LAW, PLLC**
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
Telephone 480.999.4556
docket@millsandwoods.com
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| GA, a minor child, by and through her parent, Lara Scott, and on her own behalf,<br><br>Plaintiffs,<br><br>vs.<br><br>Tanque Verde Unified School District,<br><br>Defendant. | Case No.: 4:17-cv-00436-JAS<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF THEIR OPENING BRIEF** |

In it Answering Brief, the District takes the position that G.A.'s mother, Lara, is to solely to blame for its failure to comply with the IDEA and create an appropriate IEP for the G.A. It has long been held that the school district could not blame the parents for a failure to adhere to the procedural requirements of the IDEA. *W.G. v. Target Range School District*, 960 F.2d 1479, 1484-85 (9th Cir. 1992). However, the District is indeed asking this Court to hold Lara responsible for its failure to comply with the IDEA. This Court should summarily reject the District's arguments; give no deference to the ALJ's decision; determine that the District failed to provide G.A. with a FAPE; and grant Plaintiffs their requested relief stated.

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014-2555
480.999.4556

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

## MEMORANDUM AND POINTS OF AUTHORITIES

I.   **THE ALJ WAS NIETHER THOROUGH NOR CAREFUL IN HER REVIEW OF THE RECORD**

Neither This Court can accord some deference to the ALJ's factual findings, but only where they are "thorough and careful," and "the extent of deference to be given is within our discretion." *M.C. by & through M.N. v. Antelope Valley Union High Sch. Dist.*, 858 F.3d 1189 (9th Cir. 2017) (citations omitted). The Ninth Circuit has cautioned that "neither the duration of the hearing, nor the ALJ's active involvement, nor the length of the ALJ's opinion can ensure that the ALJ was 'thorough and careful.'" *Id.* 858 F.3d at 1194.

The District agrees that the ALJ refused to consider curriculum, which was an issue that was stated in the restatement of issues and specifically addressed on the first day of the hearing. Ans. Br. at 9:6-12. This demonstrates that the ALJ was not "thorough and careful." *See M.C.* 858 F.3d at 1194. Therefore, this Court should give no deference to the ALJ's decision. *Id.*

II.  **THE DISTRICT FAILED TO CREATE APPROPRIATE IEPS**

A.   **The District Cannot Blame Lara for Its Failure to Create an Appropriate IEP**

The District had a substantive obligation under the IDEA to offer G.A. an IEP reasonably calculated to enable her to make progress appropriate in light of her circumstances. *Endrew F. ex rel. Joseph F. v. Douglas County Sch. Dist. RE-1*, 137 S. Ct. 988, 1001. (2017)

The District claims that members of the IEP Team did not believe that the changes were in G.A.'s best interest, but consented only "after being badgered by Parent and Ms. Ballou for approximately four hours." Ans. Br. at 6:3-6. In a footnote, the District cites to 20 U.S.C. § 1414(a)(D)(ii)(II), which provides: "If the parent of such child refuses to consent to services under clause (i)(II), the local educational agency shall not provide special education and related services to the child by utilizing the procedures described in section 1415 of this title." The District does not cite to any evidence that Lara did not consent to any services.

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

In the same footnote, the District cites to *Fitzgerald v. Camdenton R-III Sch. Dist.*, 439 F.3d 773, 775 (8th Cir. 2006). The *Fitzgerald* court held that, "Congress intends that a district may not force an evaluation under the circumstances in this case. Where a home-schooled child's parents refuse consent, privately educate the child, and expressly waive all benefits under the IDEA, an evaluation would have no purpose." *Id.* at 439 F.3d at 775.

Based on the District's statement and the citations, the District asserts that Lara refused services for G.A. and the District could not force the services upon G.A. This claim is not supported by anything in the record. It is undisputed that Lara did not refuse any services the District offered for G.A. It is also undisputed that during the IEP meetings, the District neither object nor disagreed with stopping the pull-out services for speech therapy, Tr. at 1153:22-54:1. In the four (4) IEP meetings and one (1) MET meeting that were recorded, transcribed, and entered as part of the record, none of the District's employees disagreed with the services that were offered to G.A. nor stated any objection, including that it was not in G.A.'s best interest. *See* K1, K3-6.

Tamara Ballou, Lara's education advocate, stated the following during the November 11, 2015 MET Meeting:

> It could be a real need, but if it's not providing (indiscernible) to G.A. and it's stressing her out, then it's not in her best interest. And if it wasn't in her best interest and you didn't agree with it, then the district had an obligation to still provide services against the parent's wishes. But -- so all I'm looking at is that statement, that it's not just Mom who made that decision.

Ex. K4 at 84:16-23. In response, Buckley agreed and stated that it was a team decision. *Id.* at 84:25-85:1.

The District is attempting to abdicate its responsibility in creating an appropriate IEP by blaming Lara and Ballou. Many school districts have attempted to blame the parents for its failures to provide a FAPE. However, it has long been held that a school district cannot blame a parent for its failures to meets its obligations under the IDEA.

In *W.G. v. Target Range School District*, 960 F.2d 1479, 1484-85 (9th Cir. 1992), the school failed to ensure the proper parties attended IEP meetings. The district in *W.G.*

argued the parents "are to blame." *Id*. at 1485. This Ninth Circuit held that the school district could not blame the parents for a failure to adhere to the procedural requirements of the IDEA. *Id*. The Act imposes on the district a duty to adhere to those requirements, and it cannot abdicate that duty by arguing that the parents were at fault. *Id*.

Similarly, in *N.B. v. Hellgate Elementary Sch. Dist., ex rel. Bd. of Directors, Missoula County, Mont.*, 541 F.3d 1202, 1209 (9th Cir. 2008), the school district argued that the parents were at fault for not procuring an autism evaluation after the school district had referred the parents to a clinic for testing. The Court held that the district could not relinquish its obligation to ensure that the child was assessed. *Id*. The parents' failure to obtain the evaluation themselves did not relieve the district of its affirmative duties under the IDEA. *Id.*; *see also Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1523 (9th Cir. 1994) (holding that a parent's failure to secure an evaluation, even if the parents agreed to obtain it, does not excuse the school district's obligation under the IDEA to secure such an evaluation). In *Union,* the court held that the "failure of the [parents] to turn over portions of a specialist's report cannot excuse the District's failure to procure the same information for itself." *Id*.

In *Anchorage Sch. Dist. v. M.P,* 689 F.3d 1047, 1055-57 (9th. Cir. 2012), the Anchorage School District claimed it was not responsible for failing to provide a FAPE because of the actions of the parents. This conclusion was not only legally incorrect, but it also vitiates the IDEA and the Ninth Circuit agreed. *Id.*

1. <u>**The District was legally obligated to procure its own report from a specialist such as Dr. Thomas**</u>

The District accuses Lara and Ballou of intentional withholding Thomas' report and not informing them of Thomas' opinions during the February 29, 2016 IEP Meeting. Ans. Br. at 19:3-12.

The District also asserts that Lara and Ballou knew that the magnifying strips were harmful at February 29, 2016 IEP Meeting and remained "silent." *Id.* at 19:8-9. These

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

accusations are unfounded and are not supported by anything in the record.[1] However, even if Lara and Ballou did know the magnifying strips were harmful and withheld that information, the District was legally obligated to procure its own report from a specialist such as Dr. Thomas. *Union*, 15 F.3d at 1523.

In *Union*, the District raised purported factual dispute that the Smiths' withheld portions of Dr. Bryna Siegel's report from the District. *Id.* The Smiths admitted that they withheld portions of Dr. Siegel's report that may have been relevant to the appropriateness of a placement at Carlton. *Id.* It was undisputed that the Smiths showed the District the pages in which Dr. Siegel *diagnosed autism. Id.* (emphasis in original). The District points to nothing in the withheld portions of the report that might have influenced its decision formally to offer Bernard a placement at McKinnon and that the Smiths would not accept placement there.

The *Union* court held that:

> … The District was ***legally obligated to procure its own report from a specialist such as Dr. Siegel***. The District must make "a full and individual evaluation of the child's educational needs," 34 C.F.R. § 300.531, and must "ensure ... [that the] evaluation [of the student] is made by a multidisciplinary team ... including at least one teacher or other specialist with knowledge in the area of suspected disability" (i.e., a specialist in autism). 34 C.F.R. § 300.532(e). Any failure of the Smiths to turn over portions of a specialist's report cannot excuse the District's failure to procure the same information for itself. (citation omitted).

*Id.* 15 F.3d at 1523–24.

Here, Cooper testified that she received Polec's vision evaluation around the time of the MET Meeting. Tr. 1069:12-70:8. Also, during the November 19, 2015 MET Meeting, Lara specifically stated that GA is "continu[ing] vision therapy once in person in – in office once a week, then daily for 30 minutes." Ex. K4, at 30:14-15. During the January 21, 2016 IEP Meeting, Lara also informed the District that G.A.'s vision doctor was

---

[1] Tamara told the IEP team during the February 29, 2016 IEP Meeting that she did not get a chance to read the vision section before the meeting. Tr. at 67:13-18.

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

performing a re-evaluation and preparing a report, which recommended continuing vision therapy. K5 at 65:7-66:2

The District knew that G.A. was receiving vision therapy and that her vision doctor was preparing a reevaluation. *Id.* Yet, the District made no effort to contact G.A.'s developmental ophthalmologists nor made any effort to procure information regarding G.A.'s vision therapy and her reevaluation. *See* K6. Now, the District is blaming Lara and Ballou for withholding information—an unsupported assertion. Lara testified that she did not have Thomas' report on February 29, 2016. Tr. at 946:1-16.[2]

Even if Lara and Ballou were withholding information, the District still had an obligation to procure the same information for itself. *Union,* at 15 F.3d at1523–24. A school district cannot abdicate its affirmative duties under the IDEA. *N.B.,* 541 F.3d at1209 (citing *W.G.,* 960 F.2d at 1484–85.)

In *W.G.,* the school failed to ensure that the proper parties were involved in the IEP meetings, as required by statute. *Id.*

> Target Range's arguments that the parents are to blame because they left the IEP meeting, did not file a dissenting report, and led the district to believe that the principal problem was transportation, are without merit. The parents had no obligation to file a dissent.
> ...
> The Act imposes upon the school district the duty to conduct a meaningful meeting with the appropriate parties. Target Range failed to do so. Target Range failed to fulfill the goal of parental participation in the IEP process and failed to develop a complete and sufficiently individualized educational program according to the procedures specified by the Act.

*Id.* at 1485.

The District failure to have someone at the February 29, 2016 IEP meeting with knowledge about G.A.'s vision and vision therapy violated the IDEA. *Id.* This failure resulted in the District's final written IEP offering assistive technology, magnifying strips, and a vision goal that were detrimental to G.A., which were detrimental to G.A. Therefore,

---

[2] Thomas' report does not mention anything regarding magnifying strips and the District has not explained how Thomas' report would have changed its final written IEP.

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

the District denied Lara the ability to participate and failed to create an appropriate IEP and both resulted in denying G.A. a FAPE.

### 2. The District Cannot Blame Lara for G.A.'s Regression

The District attempts to blame Lara for G.A.'s regression because G.A. was kept out of school from September 15, 2015, to November 30, 2015. Ans. Br. at 12:22-13-4. Despite there being no evidence to support this assertion, this is the first time that the District is raising this defense.[3] *See* Def's Closing Br. Additionally, nothing in the record supports that G.A. regressed because she was out of school[4]. As the District cited in its Brief:

> "Extended school year services must be provided only if a child's IEP team determines, on an individual basis…that the services are necessary for the provision of FAPE to the child." 34 C.F.R. § 300.106(a)(2). Arizona law requires school districts to "make extended school year services available" if either: (1) the benefits that the pupil gained during the regular school year would be significantly jeopardized if the pupil is not provided education services or (2) the pupil would experience severe or substantial regression if the pupil is not provided educational services during recesses or the summer months and the regression would result in substantial skill loss of a degree and duration that would seriously impede the pupil's progress toward educational goals. A.R.S. § 15-881(A).

Ans. Br. at 59:22-60:6.

The District statement confirms with Plaintiffs' position that ESY was essential for G.A. not to regress during extended periods of time away from school. The District never offered has the District offered nor provided ESY services prior to the February 29, 2016 final written IEP. Based on the District's own admission, this Court should determine that G.A. was denied a FAPE.

---

[3] The Court should not consider arguments made for the first time on appeal. *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir.1999) ("As a general rule, we will not consider arguments that are raised for the first time on appeal.").

[4] During the October 29, 2015 IEP Meeting, Debbie Jefferson, G.A.'s private tutor, informed the IEP team that G.A. was reading a **second-grade level with 94% accuracy and 100% comprehension**. Ex. K3 at 19:23-20:8. However, during the ***February 29, 2016 IEP Meeting, July Daley, G.A.'s third-grade teacher, informed that G.A. was reading at pre-primer level with an 80% proficient*** at recognizing her words and comprehending the material. Ex. K6 at 14:13-15.

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

**B.**     <u>Cooper testified that the G.A.'s Goals were "Essentially the Same"</u>

The District accuses Plaintiffs of "grossly mischaracteriz[ing]" Cooper's testimony regarding the same goals being copied from one IEP to next. The District claims that Cooper said the goals were similar. Ans. Br. at 47:21-22. This is false. During the hearing, Plaintiffs' counsel looked at four IEPs with the same goal. Tr. 1115:14-18:25. Plaintiffs' counsel asked Cooper, "And that's again *essentially the same* goal as we've reviewed in the three other IEPs; right? Cooper stated, "Yes." *Id*. ag 1119:01-3 (emphasis added). In *Endrew*, the Supreme Court explained that "Endrew's IEPs largely carried over the same basic goals and objectives from one year to the next, indicating that [the student] was failing to make meaningful progress toward his aims." *Endrew F. ex rel. Joseph F. v. Douglas County Sch. Dist. RE-1*, 137 S. Ct. 988, 996 (2017). No matter what adjective is used, the District carried over the same goals from year to year. *See* Ex C1, 9, 11, 13. As the Supreme Court held, this indicates that G.A. was failing to make meaningful progress. *Endrew,* 137 S. Ct. at 996.

**C.**     <u>The Arizona State Standard is Not the Standard for Creating Goals to Meet GA's Specific Needs</u>

The IDEA requires that every IEP set out "measurable annual goals, including academic and functional goals," along with a "description of how the child's progress toward meeting" those goals will be gauged. 20 U.S.C. §§ 1414(d)(1)(A)(i)(I)-(III); *Endrew*, 137 U.S. at 994

The District contends that the IEPs' goals were appropriate because each one was "specifically tied to an Arizona State Standard." Ans. Br. at 11:4-6. The District cites no authority supporting this assertion. The Arizona State Standard points to a unique identifier such as O3.L.1, which is already contained within software. Ans. Br. at 11:4-6. This predetermined standard does not include a written nor measurable goal. Moreover, the District does not explain how the goal is measurable nor that it met G.A.'s unique needs. Using the District's logic, any goal, no matter it says, is appropriate if it linked to a state standard. This is not the standard described in *Endrew*. *See Endrew,* 137 S. Ct. 988. In fact,

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

8

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

no court has held that a goal is appropriate because it is linked to a state standard. Therefore, the District failed to create goals and as a result, G.A. was denied a FAPE.

Further, instead of providing evidence demonstrating how its goals were appropriate, the District and the ALJ zeroed in on the following testimony:

> Q. And then the annual goal says GA will increase word reading fluency from a baseline of 35 cwpm with percent accuracy to 65 cwpm with 100 percent accuracy as measured by monthly one minute oral reading timings on third grade passages. Is that goal measurable?

> A. I would say it's measurable, yes because you would have a third grade passage timed for one minute, count the words. So yes, I would say it would be something that could be measured.

> Q. Where does the third grade passage come from?

> A. I do not know. So it's not specific with that regards. But if I -- yeah, I would have to correct myself and say that I would need more information in order to appropriately implement and measure this goal.

Tr. at 767:2-16. These were not "marching orders." Instead, at first glance, the goal appears measurable, but when addressing each element of the goal, DeLabio realized her mistake and stated the third-grade passage is not specific, and she "would need more information to in order to appropriately implement and measure this goal." *Id.* The District acknowledges that DeLabio "pour[ed] over practically every sentence of G.A.'s IEP" and criticized almost every goal the District created, Tr. at 684-935; yet, the District can only reference two questions regarding the appropriateness of G.A.'s goals and presented no evidence to show that the goals were in fact appropriate.[5] This is further evidence showing inappropriateness of the G.A.'s goals and how the ALJ failed to be thorough and careful in her review of the record. *See M.C.* 858 F.3d 1189.

The District also presented no evidence how G.A.'s goals were appropriate and complied with the IDEA. The District makes overreaching statements, which are not

---

[5] Carahaly testified that the speech and language goal and services offered in the February 29, 2016 IEP were not designed to provide GA with an educational benefit. Tr., at 635:22-36:18

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

supported by anything in the record. Ans. Br. at 46:20-23. The District acknowledges that it did not have all the necessary information and attempts to blame it on Lara for keeping G.A. out of School. *Id.* 46:19-20.[6] Ultimately, it is the District's obligation to comply with the IDEA. *Endrew,* 37 S. Ct. at 1001; *Anchorage Sch. Dist.* 689 F.3d at 1055 ("We have previously held that participating educational agencies cannot excuse their failure to satisfy the IDEA's procedural requirements by blaming the parents.")

### D.    The District Did Not Have Curriculum Tailored To Meet G.A.'S Unique Circumstance

The District states that "[i]n the February 29, 2016, IEP meeting, the District proposed significant resource time for G.A., knowing that she was not being successful in the setting that Parent had demanded." Ans. Br. at 59:12-14. However, the District has not provided any details of the special instruction that G.A. would have received during the resource time. ***The record shows that there was no specialized curriculum***. For example, when DeLabio conducted her observations as part of the IEE, she went to the District's resource room. DeLabio testified that "I did not see any specialized programming. And I asked what the students were working on and what they used. And what I was told was that they usually bring their work from the gen. ed. classroom and get support completing it." Tr. 852:10-14. DeLabio stated this would not be helpful for G.A.:

> Because she needs specialized curriculum to remediate the deficits that she was demonstrating, not just grade level curriculum with somebody helping her get through it. That was not, that is not going to fill in her gaps. That is not going to go back and teach her what she does not know.

*Id.* 852:115-23

DeLabio's observations mirrored Vengelen's, G.A.'s second-grade teacher, description of the resource services during G.A.'s second-grade year:

> Q. Now when the school year started out with GA she was going to the resource room for part of the day?
> A. Yes.

---

[6] Cooper testified that the school had plenty of time to evaluate GA and provide present levels prior to the February 29, 2016 IEP meeting. Tr. at 78:24-79:02.

Q. And for what purpose?
A. I would -- I had a couple kids going, and it was to receive her, whatever was on her IEP, I'm assuming. I would hand them their seat work, and they would take that with them. What actually occurred in the room I'm not sure exactly but I wouldn't know but.
Q. By their seat work, that's the work that you'd been working on in the regular classroom?
A. Yes.
Q. And they took that with them to the resource room?
A. Yes.
Q. Do you know whether they worked on it in the resource room?
A. Yes, they did because they would come back completed.

Tr. at 153:1-19,[7] 973:4:20-74:3.

Further, Gentry, the District's special education teacher, was asked if she had any specific curriculum that she used for G.A., she stated, "I do not – Okay." Tr., at 1218:25-19:5.

In the District's February 29, 2016 final written IEP, it stated that G.A. would spend more than 670 minutes a week in the resource room. Ex. C13, 2625. However, the final written IEP provided does not describe what individually tailored instruction will be taking place while G.A. is in the resource room. *Id.* DeLabio testified that you would "absolutely" expect more information about what is going on in the resource room when a child is there for 670 minutes a week. Tr. 799:22-25.

To date, the District has not explained the specialized instructions that were used nor provided any data regarding the specialized instruction. Instead, the District cites case law stating that "The IDEA does not require the District or its teacher to use specific teaching methods, strategies, or curricula." Ans. Br. at 10:3-4 (citing *Parenteau v. Prescott Unified Sch. Dist.*, No. CV 07-8072-PCT-NVW, 2008 WL 5214997, at *9 (D. Ariz. Dec. 11, 2008)). The IDEA may not require the District or its teachers to use specific methods, strategies, or curricula. However, the IDEA does require the District to identify the specific teaching methods, strategies, or curricula that District was proposing and/or using with G.A. *M.C.,* 858 F.3d at 1199. The failure to provide Lara with this basic and necessary

---

[7] Vengelen testified that it was her idea for G.A. not to go to the resource room during the Second grade and Gentry had no objections. Tr. 160:10-61:7; 936:10-18.

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

information regarding specific teaching methods, strategies, or curricula infringed upon Lara's opportunity to participate in the IEP process and denied G.A. a FAPE. *Id.*

### E.    The AT Services and Recommendations

As discussed in the Opening Brief, despite retaining an Assistive Technology ("AT") Consultant to prepare an IEE the AT consultant was not at the February 29, 2016 IEP Meeting and the District did not provide Lara with a copy of the AT's report nor was there a discussion. Instead, the District added three vague items under Related Services: "AT- Writing Software/apps," "AT reading software/apps," and "AT graphic organizer software/apps" *Id.*, at 2625. There is no way to tell what AT software is being offered or the quantities since "apps" is plural. *Id.* This is similar to the facts in *M.C.,* in which the Ninth Circuit held that the parent was denied the ability to participate in the IEP process because the District failed to specify the AT devices that were provided to M.C., including the software being used. 858 F.3d at 1199. Here, the District's failed to identify the specific writing, reading, and graphic organizer software/apps that were being offered, and therefore, denied Lara the ability to participate in the IEP process.

The District contends that a completed AT IEE was no longer needed because G.A. presented a unilateral private placement. However, the failure to have a completed report and the AT consultant at the IEP meeting denied G.A. a FAPE. During the February 29, 2016 IEP meeting, a discussion was held about the magnifying strips, a topic the District claims Ballou remained "silent:"

> MS. DALEY: But that font increasing should definitely be looked at.
> MS. BALLOU: So we've got to put it in the – in the document, if that's something that we're -- we're going to use as part of the accommodation.
> MS. DALEY: The font (indiscernible)?
> DR. COOPER: The AT software for reading is in the document.
> MS. BALLOU: That's not what -- that's not what I was asking.
> MS. SCOTT: We're talking about font size.
> FEMALE SPEAKER: We're talking about font size.
> DR. COOPER: What she's looking at is contrast and font size.
> MS. BALLOU: I don't care what she's looking at. What we're going to provide her is enlarged font or -- and/or ***the strip***.
> FEMALE SPEAKER: The magnifier, you mean?

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

MS. BALLOU: Yes. And the AT gal isn't here to -- to offer input. And you're, quite frankly, a psychologist. Now, if you -- if that's your recommendation that you will go in -- to the AT role, then play that role. But then I have further questions for you.

DR. COOPER: No. I'm sharing what she shared with me.

MS. BALLOU: Okay. Well, unfortunately, we don't have -- we don't -- we don't have here -- her here for me to ask questions for her. So right now we have enlarged font and the strip. And -- and maybe there's a formal name to that strip.

Tr. 83:07-84:12

Notwithstanding the AT Consultant not attending the IEP meeting and not having a completed report, Cooper had communicated with the AT consultant and was making recommendations to the IEP Team based off the discussions Cooper had with the AT consultant. *Id.* It was not until Ballou questioned Cooper's qualifications to opine on AT that Cooper disclosed that her recommendations were based on the communication that she had with the AT consultant. *Id.* The fact that Lara or Ballou could not obtain the same or additional information nor ask questions regarding the AT, including questions about ***magnifying strips***, infringed on Lara's ability to participate in the IEP process and denied G.A. a FAPE.

## III.   THE "CONTENTIOUS" OCTOBER 29, 2015 IEP MEETING

The District and the ALJ contend that the October 29, 2015 IEP Meeting was contentious.[8] Ans. Br. at 13:6-8, 29:24-25. However, this is far from the truth. When Hensel was asked "what do you mean adversarial?" she stated, "There was a lot of contentious activity. You, know, when I, when I spoke to mom, she was very receptive, and we had a good conversation about – she answered my questions, but I felt like the advocate questioned every single step of everything we said." Tr. 1297:18-23. Ballou questioned the District employees at the October 29, 2015 IEP Meeting because they did not have basic information regarding G.A., including present levels and supporting data, which is necessary to develop an appropriate IEP. Tr. at 74:23-75:5; 919:2-7, 986:3-23; *see* K3 at

---

[8] Besides Buckley stating that the meeting was contentious during the hearing, the District does not cite to anything specific in the record to show that Lara and Ballou were in fact being contentious during the IEP Meetings.

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

13:1814:18- 34:3-19, 55:1-7, 73:18-20, 75:10-76:5, 111:9-12:4, 140:10-15, 171:1-14, 206:6-13. The District lacked the basic understanding of G.A. that was needed to create an appropriate IEP. Ballou repeatedly attempted to explain how present levels drive goals, goals drive services, and services drive placement. *Id.*13:15-16, 79:16-80:6. 191:19-24. Ballou even pointed out and explained how the District goals were not measurable and offered her assistance to make them measurable. *Id.* at 16:10-14. Despite the District not understanding G.A., at the end of the meeting, Lara and Gray were very appreciative, grateful, and optimistic moving forward. *Id*. 223:23-24:11, 226:5-6. Gray even told Daley, "I think we kind of got into a unique situation, and thanks for being you and saving the day. *Id.* at 224:9-11. The District is attempting to paint Lara and Ballou as contentious people hoping that the Court will not see how it failed G.A. and denied her a FAPE.

Even if Lara and Ballou were contentious during the October 29, 2015 IEP meeting or any other meeting, "[n]othing in the statute makes that duty contingent on parental cooperation with, or acquiescence in, the state or local educational agency's preferred course of action." *Anchorage Sch. Dist.,* 689 F.3d at 1055. Even when parents adopt a litigious approach, a "school district cannot abdicate its affirmative duties under the IDEA." *N.B.,* 541 F. 3d at 1209.

## IV.    IT IS UNDISPUTED THAT G.A. HAS A VISUAL IMPAIRMENT

The District has agreed with Plaintiffs that the ALJ erred in ruling that G.A. did not have a visual impairment. The District now contends that G.A. was a student with a visual impairment and despite not categorizing her properly, she was always eligible for services. *See* Ans. Br. at 14:12. The District admits that it always knew G.A. had vision issues, but it did not conduct vision evaluation[9] nor provide G.A. with any vision therapy.[10]

---

[9] The screening of a student by a teacher or specialist to determine appropriate instructional strategies for curriculum implementation shall not be considered to be an evaluation for eligibility for special education and related services. 34 C.F.R. § 300.302.
[10] The District is asserting that G.A.'s only vision issue was tracking. This is demonstrably false. *See* Ex. L18

Relying on the ***school psychologist***, Cooper, the District also contends that "'vision therapy' is not an educational service that is offered by school district." Ans. Br. at 18:2-5 (citing Doc. 28-3 ¶ 4). The District does not cite to a single case or statute to support its contention. However, Plaintiffs' Opening Brief cited *Dekalb County Sch. Dist. v. M.T.V. ex rel. C.E.V.*, which held "that ***vision therapy was a necessary related service, and the School District had an obligation to provide this service to [the student]***." 413 F. Supp. 2d 1322, 1327 (N.D. Ga. 2005), *aff'd sub nom. DeKalb County Sch. Dist. v. M.T.V.*, 164 Fed. Appx. 900 (11th Cir. 2006) (emphasis added).

In *Dekalb,* M.T.V. was seen by Dr. Daniel Gottlieb, a behavioral optometrist. Dr. Gottlieb found that M.T.V. had accommodative and convergence disorder and could not sustain single vision while reading. *Id.* at. 413 F. Supp. 2d at 1326. Dr. Gottlieb recommended forty-eight sessions of visual therapy, which he felt was "medically necessary in order to reduce the visual loss and increase the visual and motor efficiencies." *Id.* Subsequently, upon a referral from the school, Dr. Spector stated that, although M.T.V. had convergence insufficiency, he recommended no vision therapy because he found M.T.V.'s ocular tracking to be normal and he found no evidence of pathological nystagmus. *Id.*

The *Dekalb* court held that

> ***The School District had the burden of establishing the proposed IEP for M.T.V. was appropriate and provided a FAPE.*** Both sides presented substantial evidence supporting their relevant contentions. The medical and expert witness evidence, as well as the credible testimony of M.T.V.'s father, established by a preponderance of the evidence that M.T.V. had developed significant visual problems by the fall of 2001. The evidence also demonstrated that without the vision therapy he received from Ms. Freant and at home during the school year, M.T.V.'s vision problems would have become much worse and eventually interfered significantly with his ability to benefit from special education. Therefore, ***vision therapy was a necessary related service, and the School District had an obligation to provide this service to M.T.V***.

*Id.* (emphasis added)

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

Here, Plaintiffs were the only party that presented any evidence regarding G.A.'s vision issues. The undisputed evidence showed that G.A. was diagnosed with Binocular Dysfunction, Pursuit Dysfunction, and Convergence Insufficiency. Ex L18; Tr. at 663:9-64:5. It is undisputed that the District was aware of G.A.'s vision issues the entire time she attended school at the District. Ans. Br. at 15:15-19

During the November 21, 2015 MET Meeting, Lara provided the District with a "Visual Information Processing Evaluation" from Polec. *See* L16, K4 at 5:4-6. Visual Information Processing Evaluation **listed 33 potential symptoms associated with Binocular Dysfunction and Pursuit Dysfunction**. L16 at 3849-50. Only one symptom related to "tracking." *Id.* The District ignores the other 32 potential symptoms associated with G.A.'s diagnosis. Polec's evaluation also recommended vision therapy for three (3) months. *Id.* at 3853.

Thomas testified to the severity of G.A.'s vision issues and stated that G.A. vision was "very, very unstable." Tr. 662:1-65:9, 666:17-67:23, 668:6-15. Undoubtedly, G.A.'s vision issues interfered significantly with her ability to benefit in the educational setting. Thomas also testified regarding the goals in G.A.'s February 29, 2016, stating that "[t]he tracking will not improve by doing these things. These things are – they are more like kind of crutches that will help her take in the information. Now the magnifying glass, that's, that's just going to give her headaches. I wouldn't recommend that at all." Tr. 671:23-72:3.[11]

Plaintiffs presented undisputed evidence that G.A. had vision issues, that the vision issues interfered with her ability to receive an educational benefit, and vision therapy was recommended, and therefore, vision therapy was a necessary related service that the District had an obligation to provide to G.A. *DeKalb*. 413 F. Supp. 2d at 1326

---

[11] The ALJ also stated that Plaintiffs submitted no evidence that G.A. had a visual impairment. ALJ Decision ¶ 16. This is another example of how the ALJ was not "thorough and careful" in her review of the record. Thus, the Court should give no deference to her decision.

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

Moreover, the District failed to inform the Court that the particular technique that the District was "famous" for was Bal-A-Vis-X. Tr.at 669:15-21. However, the District did not include any services or goals that involved Bal-A-Vis-X in G.A.'s February 29, 2016 final written IEP. *See* C13.[12]

During the entire time that G.A. attended school within the District, it failed to evaluate G.A.'s vision issues, find her eligible for services for vision impairment, and failed to provide appropriate vision therapies. Thus, the District did not meet its obligation under the IDEA to provide G.A. with a FAPE.

## V.    UNILATERAL CHANGES

As discussed in the Opening Brief, the District made intentional, distinct, and material changes to the G.A.'s IEP. It is disingenuous to claim that unilaterally changing the use of G.A.'s FM system, which G.A. depended on, removing her eligibility for speech services, and making numerous additions and deletions to G.A.'s IEP were "minor technical issues" and "both practically impossible and realistically unnecessary." Ans. Br. at 20:11-3, 21: 22-24 (citing ALJ Decision ¶ 52.)

To support its risible position, the District relies on *Lessard v. Wilton Lyndeborough Coop. Sch. Dist.*, 518 F.3d 18 (1st Cir. 2008). *See* Ans. Br. at 20:14-18. *Lessard* discusses the parent's dissatisfaction of transitional services. *Id.* 518 F.3d at 29. Specifically, that the IEP did not address activities conducted in community settings. *Id.* 518 F.3d at 30. In evaluating the "*myriad of transition services*" listed in the IEP, the court explained that the "test is whether the IEP, taken in its entirety, is reasonably calculated to enable the particular child to garner educational benefits." *Id.* (emphasis added). The *Lessard* court further explained, "that parents cannot unilaterally dictate the contents of their child's IEP." *Id.*[13] The *Lessard* court affirmed the district court's conclusion that the extant community-

---

[12] Bal-A-Vis-X was not in any of G.A.'s IEPs for the entire 2015-16 school year. C10, 11, 13.

[13] The District cites to a case that parents cannot unilaterally dictate the IEP. However, its entire brief is blaming Lara for dictating and demanding the services in G.A.'s IEPs. The

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

oriented services, when evaluated in conjunction with the IEP's other transition services, furnished the student with the requisite educational benefit. *Id.*

*Lessard* has nothing to do with unilateral changes, insufficient PWNs, nor parent participation.

The IDEA directs the District to issue a PWN whenever it "proposes" or "refuses" to initiate or change how it delivers that child's FAPE, including when they change that child's IEP. *M. v. Falmouth Sch. Dep't*, 847 F.3d 19, 23 (1st Cir.), *cert. denied sub nom. Ms. M. v. Falmouth Sch. Dept.*, 138 S. Ct. 128 (2017) (citing 20 U.S.C. § 1415(b)(3)); *Union,* 15 F.3d at 1526 ("The IDEA explicitly requires a [PWN] to parents when an educational agency proposes, or refuses, to initiate or change the educational placement of a disabled child."). Here, the PWNs must include "a description of the action proposed or refused by the agency" and "an explanation of why the agency proposes or refuses to take the action." *M.,* 847 F.3d at 23 (citing 20 U.S.C. § 1415(c)(1).

The First Circuit has held that,

> The IDEA envisions the IEP as an agreed-to general framework of a child's educational program that provides schools with a certain degree of flexibility in accomplishing the outlined objectives, while ***a [PWN] is meant to spell out more specific, but not binding, proposals for implementing that framework***.

*Id.* 847 F.3d at 28 (emphasis added).

Further, "the [PWN] serves to protect [Lara's] rights under the IDEA by enabling [her] to contribute to the IEP development process and to later make informed decisions regarding whether to challenge an educational agency's discretionary choices in a later due process hearing." *Id.* (citing *M.B. ex rel. Berns v. Hamilton Se. Schs*., 668 F.3d 851, 861 (7th Cir. 2011); *J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist*., 626 F.3d 431, 459 (9th Cir. 2010)).

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

---

District cannot blame Lara for dictating the IEP, then say that Lara cannot make unilaterally dictation the IEP.

The District admits that it made unilateral changes to G.A.'s IEP but the changes "were either immaterial or harmless and did not result did not result in a procedural violation." Ans. Br. at 21:13-14. The District does not cite to any case law to support the immaterial or harmless standard. The District ignores recent Ninth Circuit case law, which unambiguously states that "… any such ***unilateral amendment is a per se procedural violation of the IDEA*** because it vitiates the parents' right to participate at every step of the IEP drafting process" Br. at 16 19-21 (citing *M.C.* 858 F.3d at 1197)) (emphasis in Brief). Further, the District's unilateral changes infringed upon Lara's ability to use the IEP to monitor and enforce the service G.A. was to receive. *M.C.* 858 F.3d 1189.

**A.     The Unliteral Changes To The FM System Were Not Harmless**

Based on the testimony during the hearing, even the District was unclear what the terms "throughout the day," "prn" or "as needed," and "during whole group instruction" meant as they related to using G.A.'s FM system.[14] Tr. 61:21-62:12, 109:20-11:3, 247:10-18, 382:24-83:6, 410:21-11:17, 951:17-52:6 .The Able Kids report shows, G.A. has a severe auditory processing disorder and without an FM system or a filter G.A. can only process 48% of speech when white noise is present. (Doc. 17-1, GA_APPEAL-000014). G.A. can process 88% of speech with the use of a filter. *Id.* at GA_APPEAL-000019). For the District to unilaterally change the use of the FM system from "throughout the day" or "always" to something more restrictive or subjective such as "prn" or "whole group discussion" drastically limits G.A. to process speech, and ultimately denied her the ability to receive any educational benefit when the FM system is not being used.

The District and the ALJ's absurd position that each time the District changed the use of the FM system, the District did not need to issue a PWN because that would be "both practically impossible and realistically unnecessary." This is ridiculous. That means if the District changed G.A.'s FM system from "Always" to "Never" then it would not have to

---

[14] Gentry testified that she changed the language in GA's September 10, 2015 IEP from using of the FM system "throughout the day" to "PRN." Tr., at 1182:16-18. She further admitted under oath that she did so without neither a discussion nor an agreement to change in the use of the FM system at the September 10, 2015 IEP meeting. Tr. at 1183:9-12.

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

issue a PWN informing Lara of this change. This defies the very essence of the IDEA. The PWN must state specific proposals for implementing the IEP, including an explanation of why the agency proposes or refuses to take the action. *M. v. Falmouth Sch. Dep't*, 847 F.3d at 23, 28.

If any change is being made to the IEP, the change must be stated on the PWN, especially the use of the FM system, which she undisputedly relies on to receive an educational benefit. Every PWN the District's issued did not meet the statutory requirements because the District made numerous unilateral changes without providing any notice or explanation to Lara. Thus, Lara was not able to participate in the IEP process and she was denied the ability to monitor and enforce the services under the IEP. This ultimately resulted in G.A. being denied a FAPE.

**B.      The Unliteral Changes Speech/Language Eligibility, Goals And Services Were Not Harmless**

The District stated that "[a]t the September 10, 2015 meeting, Parent requested that G.A. *no longer receive pull-out speech services*." Ans. Br. 4:14-15. (citing Tr.1005-06) (emphasis added). Dr. Cooper actually testified that "She I believe at that meeting said that she felt – she didn't want [G.A.] pulled out more than necessary[.]" Tr.1005:22-24. Lara also testified that she voiced concerns with pull-out services for speech because G.A. was not making any progress and Buckley was frustrated, confused, and did not understand G.A. Tr. at 983:7-84:12. The decision to stop G.A.'s pull-out services for speech was an IEP team decision and the District did not voice any concerns about stopping the pull-out services. Tr. at 982:25-83:6, 1095:21-25.[15]

Without provided PWN with an explanation of why the District removed the eligibility, services, and goals related to speech the District violated the IDEA, which resulted in a denial of FAPE.

---

[15] Buckley also testified that Lara never requested that G.A. not have any speech services and goals. Tr.1095:21-25, 1100:9-12. However, the District unilaterally removed GA's category of eligibility for speech and language, removed all speech and language services, and removed all the speech and language goals.

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

## VI.   THE DISTRICT MUST PERMIT PARENTS TO INSPECT AND REVIEW ANY EDUCATION RECORDS RELATING TO THEIR CHILDREN THAT ARE COLLECTED, MAINTAINED, OR USED BY THE DISTRICT

The District states that "Plaintiffs did not offer any evidence or authority that such records were or had to be maintained by the District" Ans. Br. at 26:12-13. Once again, this is false. Plaintiffs cited to 34 C.F.R § 300.613 in the Opening Brief. Br. at 31:8-18.

The District ignores 34 C.F.R. § 300.613 in its argument and cites only to 34 C.F.R. § 99.3 and solely relies on the limiting language "maintained" under the regulation. However, 34 C.F.R. § 300.613 does not limit parents' ability to only inspect and review education records that the District "maintained." 34 C.F.R. § 300.613 unambiguously provides that: "Each participating agency *must* permit parents to inspect and review any education records relating to their children that are *collected, maintained, or used* by the agency under this part." (emphasis added).[16] Collected, maintained, or used is disjunctive; thus, as long the education record with either collected, maintained, or used in relation to the IEP process, then the District had to provide the records to Lara to review and inspect.

The District's relies on two cases: *Owasso Independent School District No. 1-011 v. Falvo*, 534 U.S. 426, 434 (2002) and *S.A. v. Tulare County Office of Education, S.A. v. Tulare County Office of Education*, NO. CV F-08-1215 LJO GSA, 2009 WL 3296653 (E.D. Cal. Oct. 6, 2009). However, its reliance on both cases is misplaced.

In *Owasso*, the Supreme Court only addressed "Education Records" under FERPA. 534 U.S. at 431, 122 S. Ct. at 938. There is no mention of the IDEA anywhere in the Court's decision. *Id.*

In *SA,* 2009 WL 3296653 *1, SA filed a *compliance complaint* with the California Department of Education[17] asserting that Tulare County Office of Education ("TCOE") violated federal and state law by failing to provide SA with all the requested emails and for

---

[16] Collect, maintained, or used is disjunctive. Thus, "maintained" is not a requirement for parents to review documents under the IDEA. If the documents were collected or used in connection with G.A. and in connection with anything regarding her identification, evaluations, education placement, the formulation and implementation of G.A.'s IEP, the District had an obligation to make it available for Lara to inspect and review.

[17] SA did not file due process complaint under the IDEA.

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

destroying emails without parental notification and consent. *Id.* SA requested that TCOE "'a copy of any and all electronic mail sent or received by the Department concerning or personally identifying' Student." *Id.* SA argued that TCOE must produce all emails whether in hard copy or electronic formation that identify SA under the IDEA. *Id.* at *4. The *SA* court, citing with *Owasso,* 534 U.S. at 433, stated "Student's assertion-that *all emails that identify Student*, whether in individual inboxes or the retrievable electronic database, are maintained 'in the same way the registrar maintains a student's folder in a permanent file'-is 'fanciful.'" *Id.* (emphasis added). The *SA* court, citing 34 C.F.R. § 300.613, determined that TCOE complied with the statute because TCOE provided SA with *all the emails that TCOE maintained* and granted summary judgment for TCOE. *Id.* *5.

There are fundamental differences between *S.A.* and the issues in this matter: SA did not file a due process complaint for a denial of FAPE and there is no mention that SA was a student with a disability or that SA had an IEP under the IDEA. While the *SA* court does specifically state why it only considered the "maintained" language under 34 C.F.R. § 300.613, it could easily be concluded that the court did not consider "collected" or "used" because SA was not a student eligible student under the IDEA. Thus, "collected" or "used" did not apply.

Moreover, SA requested *all* emails that identified him. *SA,* 2009 WL 3296653 *4. The IDEA does not entitle a student to *all* emails that identify a student. *See* 34 C.F.R. § 300.613. The IDEA requires the District to allow parents to "review and inspect all Education Records relating to their children that are *collected, maintained, or used* by the agency under this part." 34 C.F.R. § 300.613(a).

Here, the District did not permit Lara to review G.A.'s education record under 34 C.F.R. § 300.613. On November 12, 2015, Lara submitted a request for G.A. education record. *See* F08; TR at 306:6-15. Lara made twenty-five ("25") unique requests all related to G.A.'s identification, evaluations, education placement, the formulation and

implementation[18] of G.A.'s IEP, including but not limited to documents relating to G.A.'s progress related the IEP goals and objective; all documents or communication relating to G.A.'s progress or lack of progress, all logs showing persons who access student records[19] and all logs of services provided, and any emails or copies of electronic transfer that concern G.A. *See* F8; Tr at 1110:17-11:10.

As discussed in the Opening Brief, the District failed to provide Lara with G.A.'s education record that it collected, maintained, or used under 34 C.F.R § 300, *et seq*. Specifically, speech and language therapies log, which Buckley destroyed, Tr. 1150:16-51:3, folders and documents Gentry provided to the District. *Id.* at 445:3-8, 1207:4-13, and Lara or Tamara's requests for data that supported GA's IEP. *Id.* at 116:5-12; 124:13-16. The District's repeated refusal permitting Lara to inspect and review the critical documents there were collected and used to create G.A.'s IEP has been denied her the ability to participate in developing the IDEA. Thus, G.A. has denied a FAPE.

### A.   The Intentional Withholding And Destruction Of Documents Interfered With Lara's Ability To Participate In The IEP Process

The District contends that the "minimal amount of 'data'" that was destroyed or inadvertently withheld from Lara did not deny her the ability to participate. This is absurd.

The District claims that Plaintiffs have misinterpreted the Norrix email. Even if that was the case, the District withholding the email from Lara denied her the ability to read it and interpret it how she saw fit. The District was required to present all information to Lara and the IEP team so they could make a team decision on how to proceed regarding Norrix's

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

---

[18] The District must provide an opportunity for the parents of a child with a disability to examine all records relating to such child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to such child, and to obtain an independent educational evaluation of the child. 20 U.S.C. § 1415(b)(1)

[19] Each participating agency must keep a record of parties obtaining access to education records collected, maintained, or used under Part B of the Act (except access by parents and authorized employees of the participating agency), including the name of the party, the date access was given, and the purpose for which the party is authorized to use the records.

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

evaluation. If Lara had the email when the District received it, she would have not waited a year-and-half to send G.A. to Able Kids. Br. at 33:20-24. The Able Kids Report, which the District completely ignores in its Brief, shows that the February 29, 2016 final written IEP denied G.A. a FAPE because of the limitations the District put on using the FM systemThe Hensel email and the self-serving affidavit[20] conflict with Spolsky's testimony. Spolsky testified that she sat in Hensel's classroom for 30 minutes. Tr. 384:9-13. During the 30 minutes, Spolsky observed that G.A. was being ignored and not participating in the lesson; Hensel was not using the FM system; and G.A. was sitting at her desk playing with paperclips. *Id.* at 384:14-22. Spolsky's testimony is consistent with Hensel's email in which she states that G.A. did not participate because it was above her grade level and the FM system was not being used because Hensel was not instructing G.A. (Doc. 17-1 at GA_APPEAL-000008).

Now, the District is trying to "clarify" testimony because the withheld emails and Spolsky's testimony demonstrates that the curriculum was not being  modified; G.A. was being ignored and playing with paperclips; and Hensel was not using the FM system. This all demonstrates that the District was failing to implement G.A.'s IEP and was receiving no educational benefit.

The District cites to A.R.S. § 41-1092.07(F)(1) claiming that hearsay does not apply to administrative hearings and appeals. Ans. Br. However, A.R.S. § 41-1092.07(F)(1) provides that:

> A hearing may be conducted in an informal manner and without adherence to the rules of evidence required in judicial proceedings. Neither the manner of conducting the hearing nor the failure to adhere to the rules of evidence required in judicial proceedings is grounds for reversing any administrative decision or order if the evidence supporting the decision or order is substantial, reliable and probative.

Plaintiffs are not requesting that the Court overturn the ALJ's decision on the sole basis of Glennon's affidavit. Plaintiffs request that the Court not consider the affidavit because it is

---

[20] Conveniently, the District submitted an affidavit but did not submit the purported modified dragonfly lesson.

hearsay and duplicative. Br. at 35:12-18. Further, District's IT person could have submitted an affidavit. *See D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 253 (3d Cir. 2012) (citations omitted). He or she has first-hand knowledge of the searches that were conducted and the results of those searches.

## VII.   THE FEBRUARY 29, 2016 IEP WAS THE DISTRICT'S FINAL WRITTEN IEP

The IDEA specifically defines an IEP as a written document: "The term 'individualized education program' or 'IEP' means a ***written statement*** for each child with a disability that is developed, reviewed and revised in accordance with this section...." 20 U.S.C. § 1414(d)(1)(A)(i) (emphasis added).

The Ninth Circuit has held that the IDEA requires a school district to make a clear, written offer of FAPE in an IEP so parents can fully appreciate, evaluate, and accept or deny the offer:

> We find that this formal requirement has an important purpose that is not merely technical, and we therefore believe it should be enforced rigorously. The requirement of a ***formal, written offer creates a clear record that will do much to eliminate troublesome factual disputes*** many years later about when placements were offered, what placements were offered, *and what additional educational assistance was offered to supplement a placement, if any. Furthermore, a formal, specific offer from a school District will greatly assist parents in 'present[ing] complaints with respect to any matter relating to the ... educational placement of the child.'*"

*Union,* 15 F.3d at 1526.

The Ninth Circuit, citing to the United States Supreme Court, reasoned this vigorous enforcement was proper under the IDEA because the "elaborate and highly specific procedural safeguards embodied in [the IDEA]" make clear Congress' intent to attach significant importance to these procedural safeguards*. Id.* (internal citations omitted).

The Ninth Circuit has held that, "We find that a school district cannot escape its obligation under the IDEA to offer formally an appropriate educational placement by arguing that a disabled child's parents expressed unwillingness to accept that placement." *Union*, 15 F.3d at 1526 (citing 20 U.S.C. § 1415(b)(1)(C)). Further, "a formal, specific

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

offer from a school district will greatly assist parents in 'present[ing] complaints with respect to any matter relating to the ... educational placement of the child.'" *Id.* (quoting 20 U.S.C. § 1415(b)(1)(E)).

## VIII.   G.A.'S PLACEMENT AT PATHWAYS IS PROPER

The District argues that Pathways is not proper because "The IDEA also requires that disabled students be placed in the least restrictive environment." Ans. Br. at 56:22-23 (citations omitted). However, parents need not meet the "least restrictive environment" test in demonstrating that a private placement is proper under the IDEA. *See, e.g., Rome Sch. Comm. v. Mrs. B.,* 247 F.3d 29, 33 n. 5 (1st Cir. 2001) (propriety of a unilateral placement "is a different issue, and one viewed more favorably to the parent, than the question whether this residential placement was required in order to provide a free appropriate education to DC."); *Warren G. ex rel. Tom G. v. Cumberland Cnty. Sch. Dist.,* 190 F.3d 80, 84 (3d Cir. 1999) (agreeing that "imposition of the least-restrictive environment requirement on private placements would vitiate the parental right of unilateral withdrawal"; noting, "An appropriate private placement is not disqualified because it is a more restrictive environment than that of the public placement."); *Babb ex rel. Babb v. Knox Cnty. Sch. Sys.,* 965 F.2d 104, 108 (6th Cir.1992) (same).

## IX.   THE DISTRICT'S FAILURE TO PROPERLY RESPOND TO THE DUE PROCESS COMPLAINT ADVERSELY EFFECTED PLAINTIFFS

Under the IDEA, the District's response to a due process complaint ***must*** include: (1) an explanation of why the agency proposed or refused to take the action raised in the complaint; (2) a description of other options that the IEP Team considered and the reasons why those options were rejected; (3) a description of each evaluation procedure, assessment, record, or report the agency used as the basis for the proposed or refused action; ***and*** (4) a description of the factors that are relevant to the agency's proposal or refusal. U.S.C. §§ 1415(c)(2)(B)(i)(I)(aa)-(dd).

In response to the Plaintiffs' 401 paragraph due process complaint the District stated:

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

The IEPs and other documents referenced in the Complaint speak for themselves.

The Prior Written Notices issued by the District set forth why the District took or refused to take the actions that it did.

The District did not pre-determine placement or services for [G.A.].

The IEPs developed for [G.A.] and implemented by the District provided her with a Free Appropriate Public Education and contained all of the elements required in an IEP.

Services were provided by qualified, trained providers.

***Any claims based on events that occurred prior to August 24, 2014, are barred by 20 U.S.C. § 1415(f)(3)(c).***

***The IEP that was in effect between the start of school and September 11, 2014, was written during the 2013-2014 school year. If Petitioner is claiming that that IEP is defective, any claim based on that is barred by 20 U.S.C. §1415(f)(3)(c).***

The IEP developed in February, 2016, was calculated to provide Greta with a Free Appropriate Public Education and contained all of the elements required in an IEP.

Nothing in IDEA or its implementing regulations provides that parents or their advocates have the right to observe in children's classrooms. The parent was a full participant in the development of Greta's IEPs.

Resp. to Compl. (emphasis added).

The District responded to Plaintiffs' 401 paragraph due process complaint with nine (9) paragraphs—nearly 25% of its response was ***affirmative defenses***. *Id.* The District argues that Fed. R. Civ. P. 8 does not apply to the IDEA. However, the District asserted affirmative defenses as part of as of its Response. *See* Resp. to Compl. Affirmative defenses, including statute of limitations, ***are provided under Fed. Civ. P. 8(c)(1)***. Now, after failing to address all of Plaintiffs' allegations in their due process complaint, the District avers that Rule 8 does not apply to the IDEA. As discussed in *M.C.*:

Like an answer to a complaint, a response serves an important dual purpose: ***It gives notice of the issues in dispute and binds the answering party to a position***." *See, e.g., United States* v. *All Assets Held at Bank Julius Baer & Co.*, 959 F.Supp.2d 81, 116 n.21 (D.D.C. 2013) (noting that "one function of an answer" is to identify "points of disagreement"); *Lopez* v. *U.S.*

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

> *Fidelity & Guaranty Co.*, 18 F.R.D. 59, 61 (D. Alaska 1955) (explaining that the purpose of rules governing answers to a complaint "is to prevent surprise"). Failure to file a response puts the opposing party at a serious disadvantage in preparing for the hearing, as it must guess what defenses the opposing party will raise. The problem is particularly severe in IDEA cases because there is no discovery.

858 F.3d at 1196.

Here, the District failed to address each allegation in Plaintiffs' due process complaint.[21] *See* Resp. to Compl. The District did not even include a statement that denied every allegation unless admitted.[22] *Id*. Now, after the fact, the District is asking this Court to infer that it denied the remaining allegations. Ans. Br. at 62:3-8.

Further, as explained in the Opening Brief and herein, the District's PWNs were not sufficient under the IDEA. For the District to refer to the its insufficient PWNs in it Response to support a purported denial, puts Plaintiffs at an enormous disadvantage because the PWNs failed to meet the requirements under 20 U.S.C. §§ 1415(c)(2)(B)(i)(I)(aa)-(dd). Without the ability to conduct discovery, Plaintiffs were forced to guess at what position the District would take. It is also should be noted that Plaintiffs rested their case on February 17, 2017. Tr. at 863:2-4. However, the District had three (3) months to prepare its defense since it did not put on its case until May 8, 2017. Tr. at 999:1-7. If the District properly addressed each of the Plaintiffs' allegations under 20 U.S.C. §§ 1415(c)(2)(B)(i)(I)(aa)-(dd) and Fed. R. Civ. P. 8(b), the District would have been bound to a position and been unable to change its entire defense after the Plaintiffs had put on their entire case. Undoubtedly, this affected the Plaintiffs and puts them at an extreme disadvantage. *See M.C.* 858 F.3d at 1199.

---

[21] The District addressed all 110 paragraphs in Plaintiffs' appeal to this Court. *See* Docs 7, 8). The District used a single sentence to deny paragraphs 6-18, 20- 68 and 70-110. (Docs. 7 ¶ 2, 8 ¶ 2).

[22] The District's Amended Answer stated, "All allegations not specifically admitted above are denied." (Docs.7 ¶ 6, 8 ¶ 7).

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

## X.   <u>CONCLUSION</u>

For the reasons stated in the Open Brief and herein, this court should find the District violated IDEA and failed to provide a FAPE for G.A. Each prayer for relief the Plaintiffs request should be granted: reimbursement for private assessments; round trip reimbursement for all transportation to all previously paid IEEs and future IEEs; reimbursement for all privately paid educational and therapeutic services and tuition incurred from September 2015 to the present day, and round trip transportation to these services; revision of G.A.'s IEP to include goals and objectives in all necessary areas after the appropriate assessments have been conducted in order to continue in General Education placement with appropriate therapies and support.; placement and supports that appropriately addresses G.A.'s unique needs; appropriate speech and language services based on an appropriate assessment; appropriate occupational therapy and adaptive physical education or physical therapy services based on an appropriate assessment; provision of academic support to ensure G.A. meets grade level standards; compensatory education, services, and relief for the failure to provide G.A. with an appropriate program since April 2014 and as set forth herein; placement and funding of G.A. at a Private Day school with support for the 2016-2017 school year and all subsequent school years and ESY; a declaration that the present private placement of GA at Pathways is necessary in order for the District to provide a FAPE to G.A. pursuant to the IDEA, 20 U.S.C. §§ 1400, *et seq.*; an award of reasonable attorney's fees, costs, and disbursements expended in this matter both in the administrative hearing and in this action pursuant to 20 U.S.C. § 1415(i)(3)(B)(i)(I); and for any other and further relief the hearing officer deems equitable and appropriate. Compl. ¶¶ 389-401.

**RESPECTFULLY SUBMITTED** this 28th day of January 2019.

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

1

2

**MILLS + WOODS LAW, PLLC**

3

4
By____/s/ Sean A. Woods_____
       Robert T. Mills

5
       Sean A. Woods
       Jordan C. Wolff

6
       5055 North 12th Street, Suite 101
       Phoenix, AZ 85014

7
       *Attorneys for Plaintiffs*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

**CERTIFICATE OF SERVICE**

I certify that on the 28th day of January 2019, I electronically transmitted the foregoing document to the Clerk's Office using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Denise M. Bainton
Sesaly O. Stamps
DECONCINI MCDONALD YETWIN & LACY, P.C.
2525 East Broadway Blvd., Suite 200
Tucson, AZ 85716-5300


        /s/ Jordan C. Wolff
_____

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556